WILLIAM B. FEY, Appellant, v. HOWARD C. KING, Appellee.

LIBEL AND SLANDER: Libel Per Se—"Defamation" Defined. A
1    "malicious defamation" is an essential element of a libel *per se,* and may be defined as a malicious attack on the *character* or *integrity* of a person. It necessarily follows that a publication concerning a person is not libelous *per se* simply because such publication (1) tends to provoke the person to wrath, or (2) tends to expose the person to public hatred, contempt, or ridicule, or (3) tends to deprive the person of the benefits of public confidence and social intercourse. So held as to a publication which severely censured a party for being *a zealous law enforcer.*

WEAVER and PRESTON, JJ., dissent.

APPEAL AND ERROR: Harmless Error—Inconsequential Matter. A
2    plaintiff who has no cause of action may not predicate error on the exclusion of a mere evidentiary makeweight.

*Appeal from Lyon District Court.*—C. C. BRADLEY, Judge.

NOVEMBER 21, 1922.

ACTION for damages for libel. Plaintiff proved the publication of the writing complained of, and rested. Upon motion, the court directed a verdict for the defendant, and the plaintiff appeals.—*Affirmed.*

*E. C. Roach, W. C. Garbeson,* and *E. E. Wagner,* for appellant.

*Simon Fisher* and *S. D. Riniker,* for appellee.

EVANS, J.—I. The defendant is a newspaper publisher, and was charged in the petition with the publication of a libelous writing concerning the plaintiff. Three published writings were

1. LIBEL AND
SLANDER:
libel *per se*:
"defamation"
defined.

put into the record, and may as well be set forth here. Each writing was published upon the date indicated. They were the following:

"Dec. 16, 1915.

"Takes Spite Out on Lyon County's Fair.

"W. B. Fey, of Rock Rapids, Sought to have State Aid Withheld.

"W. B. (Billy Sunday) Fey, of Rock Rapids, whose morals were so grievously shocked during the county fair when he saw some of the best known people in the county buying paddles in an effort to secure a novelty doll that he had straightway determined to invoke the aid of the law in an underhanded, roundabout way, and incidentally square up a few of his personal grudges, has been let down by the state authorities in a no uncertain manner. He appeared last week before the Des Moines state officials and protested against the state allowing Lyon County's fair the $750 to which it is honestly and legally entitled, and they decided there was no foundation to his allegations, and voted to allow this sum. Mr. Fey announced to the newspaper men present that he would try to secure an injunction, but there is no doubt that he is regarded as a crank, and will receive scant consideration, should he apply for one. Rock Rapids people are incensed at his actions. They regard him as an interloper, and question his motives. They claim that he isn't even a taxpayer, and that his only desire is to satisfy personal selfishness and grudges. * * * Regardless of his personal dislikes, it would seem that his efforts to cripple a county's fair deserve condemnation. No loyal citizen of the county would be guilty of trying to cripple a public institution merely because some features or some of its management were objectionable to him."

"December 23, 1915.
"Correction Due Fey in the Fair Protest.
"Rock Rapids Man Didn't Go About This in Underhand Manner.

"A correction is due W. B. Fey, of Rock Rapids, whose manner of bringing about the protest in the matter of allowing the Lyon County Fair the sum of $750 was open and above-board, so far as we have learned. Mr. Fey went about it openly, and it was known that he was going to protest the matter. Hence, the correction which is justified by the facts and in fairness should be made, and the writer of the article last week had no malicious intent in the matter. Mr. Fey also says he acted without any spite whatsoever, and was actuated solely by a desire to enforce the law. His protest against the alleged law violation at the time, and his subsequent protest to the board of agriculture, bear out his denial of any underhand methods in the fight to have the fair's claim disallowed. The fair management last year shut down the doll lottery when Mr. Fey protested, and called up the Sheldon fair management, and the latter stated they had an opinion from the attorney-general's office that the sale of lead pencils and awarding of dolls was not gambling and therefore the management decided to let the doll men continue their business. The state auditor now says, or he did last week-end, that he would not issue a warrant except on the advice of the attorney-general. Some say that, if the fair is debarred from receiving the $750 due, it will act as a stay against any future state aid. To cause the fair to lose this sum looks unnecessary, when the best thing would have been to have had the men arrested, and thus threshed the matter out in court. The fair management believed it was in the right, and with an opinion from the attorney-general's office to back it up, acted in good faith. The fight against the allowance of the $750 has a tendency to injure the fair, and Rock Rapids business men as a rule are not in sympathy, and do not indorse the move."

"Jan. 6, 1916.
"Attorney-General Rules Against Fair.
"Offers an Opinion that Lyon Isn't entitled to State Aid.

"The attorney-general of Iowa has offered an opinion to

the auditor of state that Lyon County isn't entitled to state aid for its county fair, and the auditor will not issue a warrant for the $750 at the present time. While it is possible the fair will lose this sum to which it is really entitled, yet it will not be hurt to any great extent, as the association, which numbers over 400 stockholders, is in good shape financially, and is able to withstand the loss of this sum and still come back with the best county fair in the state. It is rather unlikely, though, that the attorney-general's 'opinion' will end the matter.''

The first of the foregoing articles furnishes the basis of this action. The second was a purported retraction, made upon demand of the plaintiff. The third was offered in evidence for the plaintiff on the trial, and objection thereto was sustained. Error is assigned on such ruling. The contention for the plaintiff is that the publication charged in the petition was libelous *per se*, and that he was, therefore, entitled to a verdict for damages in some amount. This contention is based upon the assumed legal proposition that any publication concerning a person which tends to provoke him to wrath or expose him to public hatred or ridicule or to deprive him of public confidence and social intercourse is libelous *per se*. If such legal proposition be sound, then plaintiff is entitled to a reversal. But the proposition is essential to plaintiff's success; and if it cannot be sustained, the plaintiff cannot prevail.

The action is predicated upon Section 5086 of the Code, which is as follows:

''A libel is a malicious defamation of a person, made public by any printing, writing, sign, picture, representation or effigy, tending to provoke him to wrath or expose him to public hatred, contempt or ridicule, or to deprive him of the benefits of public confidence and social intercourse; * * *''

This is a definition of criminal libel, for which the offender may be prosecuted and punished by the state. It does not purport to supersede civil liability at common law for libel other than criminal, where special damages are shown to have resulted. It is doubtless true that a criminal libel, if proven and not justified, must be deemed libelous *per se*. It is not true that Section 5086 ''makes any printing a libel if it tends to provoke

to wrath or to expose to public hatred or ridicule." It is to be conceded that this is contradictory to some expressions to be found in the discussion of some of our cases, and it will be our purpose here to correct such expression.

The crime of libel consists of two elements: (1) Malicious *defamation* of a person; (2) *publication* of such defamation "by any printing, writing, sign, picture, representation or effigy, tending to provoke him to wrath or expose him to public hatred, contempt or ridicule, or to deprive him of the benefits of public confidence and social intercourse." Code Section 5086.

Both of these elements must concur, in order to constitute statutory libel. *Defamation* is not *criminally libelous,* unless published in the manner indicated. *Publication* is not *criminally* libelous, unless the matter published be defamatory. Some of our cases seem to assume that the subject-matter of a publication may be rendered defamatory by the publication itself, where such publication tends to provoke the injured person to wrath or to subject him to ridicule. But the publication of nondefamatory matter will not render such matter defamatory, however provocative to wrath or ridicule it may seem to be. The first requisite of statutory libel is that the published matter be *defamatory,* in a legal sense. If it is not defamatory in such sense *before* publication, it does not become so *by* publication. If it be defamatory, then the method of publication which will render it libelous is sweeping and comprehensive. It need not be by printed words. It may be by cartoon, caricature, effigy, or sign, provided that the method adopted does tend to provoke to wrath and to subject to ridicule or to public hatred and contempt.

"Defamation," like "fraud," has no concise definition. Broadly speaking, it is an attack upon the reputation of another. "Reputation" is also a broad and indefinite term; but in the law of libel, reference is had thereby in general to the integrity and moral character of the injured party. If one were to assail the good reputation of another as a skillful golfer, it would not be defamation, and could not be libelous under the statute; and this is so even though the attack were contemptuous,

and were published in the Golf Column, and were provocative of great wrath. Publications may, and often do, provoke a person to wrath which do not impugn his integrity or his moral character. Neither the publication nor the wrath provoked thereby is the criterion which determines the character of the published matter as defamatory or nondefamatory. The rule, as gathered from many authorities, has been stated as follows:

"Defamatory words, to be libelous *per se,* must be of such a nature that the court can presume as matter of law that they will tend to disgrace and degrade the party or hold him up to public hatred, contempt, or ridicule or cause him to be shunned and avoided. The imputation must be one tending to affect a party in a society whose standard of opinion the court can recognize. In many cases, moreover, words charging plaintiff with the commission of acts permissible in law, although they may lack public approval, have been held not to expose plaintiff to hatred, contempt, ridicule, or disgrace in the sense or to the degree required by the law of libel; as, for instance, charging one with setting up the statute of limitations, or the illegality of a contract, as a defense. To accuse one of being deficient in some quality which the law does not require him as a good citizen to possess is not libelous *per se.* Mere general abuse and scurrility, however ill-natured and vexatious, is no more actionable when written than when spoken, if it does not convey a degrading charge or imputation." 25 Cyc. 253, 254, 255.

In *Hollenbeck v. Hall,* 103 Iowa 214, the publication complained of by plaintiff included the following:

"Having no other defense, he cowardly slinks behind that of statutory limitation. Such a course is not exactly in accordance with our idea of strict integrity. So far as we are concerned, we would prefer not to be connected in an official capacity with a corporation giving employment to men of this character."

It was contended for the plaintiff that the publication of such matter tended to provoke the plaintiff to wrath, and to bring him into disrepute and ridicule. This was manifestly so. We held, however, that it was not defamatory, in that he was accused only of doing that which he had a right, under the law,

to do. Such an accusation could not be deemed an attack upon his integrity or moral character. In *Homer v. Engelhardt*, 117 Mass. 539, the publication complained of, accused and upbraided the plaintiff for having repudiated an honest indebtedness for liquor sold, by availing himself of the provisions of the "prohibitory liquor law," which rendered such indebtedness void. This publication tended to provoke the plaintiff to wrath, and it did subject him to the contempt and ridicule of a considerable percentage of his associates and of the inhabitants of his community. The court found, however, that the subject-matter of publication was not defamatory, because the plaintiff had the right, under the law, to do what he was accused of doing. Published criticism and vituperation are not necessarily libelous. Men publish hard sayings about each other because of conflicting policies and purposes, and yet without imputation against the integrity or moral character. One man is subjected to ridicule by being published as a "temperance crank;" another as a "Sunday-school superintendent;" another as "puritanic;" another as a "pussy-foot" or a "sissy" or a "hypocrite" or a "Pharisee." Sharp stings are put into such epithets, and they often bring a man into the contempt of a considerable percentage of those who are not in sympathy with his standards. If provocation to wrath and subjection to contempt and ridicule are to be deemed the criterion which renders the subject-matter of the publication defamatory or otherwise, then these quoted epithets become defamatory,—not only these, but substantially all vituperation and criticism which may be mutually indulged in, in the newspaper arena.

To so hold would reduce Section 5086 to the following form:

"Libel is the publication of any hostile statement concerning another which tends to provoke him to wrath or expose him to ridicule."

By such construction we would destroy half of the statute. The membership of the court has not been in harmony of view as to the proper construction of this statute, and this accounts for some of the confusion which has crept into our utterances. The case of *Jones v. Register & Leader Co.*, 177 Iowa 144, is

quite illustrative of this difference of view. In that case, the
action was upon two counts of libel. The trial court held, in
effect, that neither count disclosed defamatory matter, and dis-
missed the petition. The case was affirmed here, not only by a
divided court, but by divided opinion as between the majority
justices who favored an affirmance. The writer of the majority
opinion expressed the view therein that Code Section 5086
"makes any printing a libel if it tends to provoke the one of
whom it is published to wrath, or tends to expose him to public
hatred or ridicule, or tends to deprive him of the benefits of
public confidence or social intercourse;" and that the trial court
erred in holding the publication to be nonlibelous. Notwith-
standing this view, the affirmance was put upon the ground that
only nominal damages were recoverable, and that a reversal
would not be awarded for that purpose. One justice concurred
in the opinion as written. The other five justices refused to
concur in the view above expressed. Of these, two concurred
specially in the affirmance, with an expression of view sustain-
ing the trial court that neither count showed publication of mat-
ter which was defamatory. The other three justices, dissenting,
held that the publication charged in the first count of plaintiff's
petition did show defamatory matter, in that it assailed the in-
tegrity of the plaintiff. As to the second count, they held that
it did not disclose defamatory matter. The following quotation
from the dissenting opinion will indicate its general trend in
that regard:

"As to the second count, we dissent from the holding of the
court that the article published is libelous *per se*, for the reason
that it is not sufficient that its publication disturb the mental
equanimity of the party against whom it is published, or that
it provoke him to wrath. It must be defamatory in order to be
actionable *per se*. * * * A violation of this statute [Section 5086]
is a violation of an inhibition enacted for the purpose of pro-
tecting a citizen from being defamed, and is actionable *per se*
only when defamatory. * * * Many things can be said in public
print about a man which may provoke him to wrath, may ex-
pose him to ridicule in a certain sense, and yet not reflect upon
his integrity as a man, or his standing as an honorable, upright

citizen, or reflect injuriously upon his character. To be libelous, it must be defamatory and malicious, and tend to provoke him to wrath. It is not sufficient that it so tends. It must reach further, and reflect upon his integrity and his character, his reputation, his good name, his good fame and standing in the community, and must injuriously affect him in this respect in the estimation of others, before it can be said to be libelous *per se. * * ** The worst that can be said for this article is that its publication might have a tendency to provoke the plaintiff to wrath, and this is not sufficient to make it libelous *per se.*"

It will be seen from the foregoing that five justices of the court refused their concurrence to the proposition that *"any printing"* is a libel, if it tends to provoke to wrath or to expose to public hatred or ridicule, or to deprive one of the benefits of public confidence or social intercourse; and that the same five justices agreed in the pronouncement that defamation is an essential element of criminal libel.

Turning now to the plaintiff's petition and its exhibit: What was the nature of the attack upon plaintiff's character thereby disclosed? The substance of the publication and its inferences were that the county fair authorities had permitted at the county fair a mild form of gambling or a species of lottery, which, under the law, forfeited their right to state aid; that loyalty to the local community by the residents thereof required that there should be no divulgence of such fact to the higher authorities; that the plaintiff, notwithstanding, had made such divulgence, and had interested himself in enforcing the forfeiture; that such conduct on his part was disloyal and dishonorable towards the community of which he was a part, and towards the management of the county fair. Whatever epithets were applied to the plaintiff were predicated upon such conduct. The article not only disclosed the plaintiff as being zealous in enforcing the penalty for permitting gambling at the county fair, but it disclosed also the lower level of defendant's own ideal of the duties of a citizen. Whether consciously and intentionally or not, the defendant put himself upon a lower plane of character in the eyes of the law-abiding public than he put the plaintiff. What the plaintiff was represented as doing was what

he had a right to do; it was what he had a duty to do, in common with every law-abiding citizen. The standard set up by the defendant by which to adjudge the plaintiff, and by which he revealed himself, was repellent to the conscience of many law-abiding people. Whatever defamation, therefore, was involved in the article was a self-defamation, rather than a defamation of the plaintiff. In the struggle of civilized society for higher ideals of law and government, there is a constant and legitimate warfare. Some degree of vituperation must be tolerated, in the interest of the larger peace of the community. If all vituperation and ridicule were actionable *per se*, litigation—and much of it petty—would engulf society. It is often true in a community that the conscience of someone therein is more sensitive to certain prevalent evils than is the average conscience of the community spokesmen. Such a person is often classified as a "crank," and is made to endure isolation and ridicule. Ostracism in some degree is a concomitant of an aggressive conscience and of strict enforcement of the law. In the interest of the public good, this is a hardness, to be endured courageously, if not cheerfully, by the man whose ideals impel him to such a course. He must needs be of stern stuff who, in defense of public morals, defies public ridicule, and who does not cry under its lash. But if he list his wounds and sue upon the invoice, then his ideals are reduced to a mercenary computation, which would become too expensive for the public and too profitable for the fighter. This is one of the broad underlying reasons why the law takes account of the distinction between wounds defamatory and wounds nondefamatory.

In the case before us, we are required to hold that the article published against the plaintiff was not defamatory, in that all its vituperation was predicated upon acts which the plaintiff had a lawful right, and even a duty, to do. In defeating him, we do not decry him, nor do we espouse his adversary.

II. The second assignment of error relates to the ruling of the court in refusing admission in evidence of the third article above set forth. This was offered in evidence by the plaintiff, supposedly on the theory that it was an admission of the jus-

2. APPEAL AND
ERROR: harm-
less error: in-
consequential
matter.

tification of the plaintiff's past conduct. It will be readily seen that, if we are correct in the foregoing division of this opinion, the introduction of this testimony could not aid the plaintiff. On the other hand, if our conclusion were otherwise, and we were to hold that the publication was libelous *per se*, the plaintiff had no need of the evidence thus offered. It supported no issue upon which he had a burden of proof. The article had in it something in the nature of a retraction and something in the nature of justification of the plaintiff in what he did; but the plaintiff could have had no interest in proving either the retraction or the justification. It was, therefore, nonprejudicial error, if any, to refuse such evidence.

For the reasons stated in the first division hereof, the judgment below is—*Affirmed.*


STEVENS, C. J., ARTHUR, FAVILLE, and DE GRAFF, JJ., concur.


WEAVER, J. (dissenting.) I cannot concur in the opinion prepared by Mr. Justice Evans. Though not so declaring, it effectually overrules at least a dozen of our own decisions, and puts us out of harmony with the courts of all our sister jurisdictions in the United States.

I. This radical departure is sought to be justified by framing a definition of libel which has no support in precedent or in the statute. If any question can ever be regarded as settled by legislative act and uniform judicial interpretation, it is that in this state, libel, whether in civil or criminal proceedings, is just what the statute quoted by the majority declares it to be: Any "malicious defamation of a person, made public by any printing, writing, sign, picture, representation or effigy, tending to provoke him to wrath *or* expose him to public hatred, contempt or ridicule, *or* to deprive him of the benefits of public confidence and social intercourse." Code Section 5086.

The vice of the argument by the majority in this case is not in any express denial of the authority of the statute, but in limiting its effect to cases in which the alleged libel "impugns the integrity or moral character" of the complaining party, and

from this premise reaching the conclusion that, as the printed matter here complained of did not attack or impugn the plaintiff's integrity or moral character, and accused him of nothing which he had not the legal right to do, it was not libelous, even though it may have tended to provoke him to wrath or expose him to public contempt or ridicule, or to deprive him of the confidence of the public. In other words, the legal effect of such holding is that a publication is libelous only when it is of a character to constitute slander, if published orally. That this is not the law, and that to constitute libel the language need not be slanderous, nor express or imply a charge affecting the moral character or integrity of its victim, is thoroughly settled. It is libel if it be malicious, false, and defamatory, and it is defamatory if it be of a character calculated to bring the person into disrepute or deprive him of the benefits of public confidence or social intercourse, even though the language be not slanderous *per se;* and if it be of such injurious character, it is presumed to be both malicious and false, without express proof thereof. The soundness of this rule is recognized by all the authorities. *Halley v. Gregg,* 74 Iowa 563, 565; *Call v. Larabee,* 60 Iowa 212; *Children v. Shinn,* 168 Iowa 531, 543; *Morse v. Times-Republican Ptg. Co.,* 124 Iowa 707; *Hughes v. Samuels Bros.,* 179 Iowa 1077, 1087; *Stewart v. Pierce,* 93 Iowa 136; *Turner v. Brien,* 184 Iowa 320, 324; *Codner v. Central C. R. Agency,* 180 Iowa 188. And see the rule as stated in 1 Cooley on Torts (3d Ed.) 402, where it is said that:

"Any words that tend to lower the plaintiff in the estimation of his friends *or* in the common estimation of citizens, *or* that tend to injure his social character or status, *or* to destroy the confidence of his neighbors in his integrity, are libelous *per se.*"

The authorities to this effect are exceedingly numerous, and practically without question. The reasonableness and justice of the rule are well stated in our own case, *Hughes v. Samuels Bros.,* supra, where it is said:

"Every written publication, maliciously made, defamatory of another; which tends to any of the consequences set out in the statute, is a violation of the inhibitions of the statute. It is, therefore, a wrong done to a citizen in violation of the statute.

It is, therefore, actionable *per se.* The fact that it is a violation of the inhibition of the statute makes it actionable *per se.* In contemplation of law, reputation is a delicate plant, withered by the breath of scandal. Any publication which imputes to another conduct which right-thinking men condemn, whether the conduct involve a crime, moral turpitude, or any conduct in life, purpose, or manner of living which the common sense of right-thinking men condemns, is presumed in law to have injuriously affected the reputation of the person so assailed, and, by such injury, to have caused him some damage. It follows, therefore, that libel is an assault upon character resulting in some injury to the reputation. The injury must be traceable to the assault, and the damage must be the proximate result of the injury. Everyone recognizes the blighting effect of scandalous utterances directed against the character, conduct, or reputation of men. Everyone recognizes that such assaults, publicly made, tend injuriously to affect the reputation and standing of the one so assailed among his fellows. It is from the recognition of this that the law implies damages, without allegation or proof of special damages. Defamation consists in maliciously poisoning the minds of others against the party assaulted, by printing, writing, etc., thereby bringing on them some of the consequences provided against in the statute. The statute is intended to, and does, prohibit the malicious poisoning of the minds of others against a citizen, under the protection of the law, by the use of public printing, etc., and this inhibition attaches whether done directly by the wording of the thing complained of, or indirectly by insinuation, imputation or suggestion. The statute is intended to protect one in a right, and to deny to others the liberty to invade that right.''

II. The discussion by the majority is based upon an entire misconception of the nature of plaintiff's complaint, as well as of the applicable law. The opinion assumes that the alleged libel has reference to the charge or allegation that plaintiff had interfered with certain alleged gambling practices at a county fair, and that, as such activities were admittedly within his legal rights as a citizen, the publication could not reasonably be considered injurious to the plaintiff, or entitle him to a recovery

of damages. If this were a true or accurate statement of the situation, I could readily agree with the majority. But it is *not* the situation, and is *not* the issue presented for trial. The libel is *not* in the statement of the acts attributed to the plaintiff, but in its aspersions upon the character of the plaintiff and the motives by which he was actuated. It in substance charges the plaintiff with being a crank, a meddler, and an interloper, a man who, under hypocritical pretense of enforcing the law, seeks to gratify his personal dislikes and grudges, and through spite would deprive the local fair association of the allowance to which it was honestly and legally entitled; and that his conduct was unworthy of a loyal citizen of the county. If this be not libel *per se,* then the law upon the subject has been hopelessly out of joint during the entire period of our judicial history. The pronouncement of the majority that it is not enough to constitute libel that it be a mere "publication concerning a person which tends to provoke him to wrath or expose him to public hatred or ridicule or deprive him of public confidence or social intercourse" is, of course, correct. Nobody argues otherwise. The proposition is a mere "man of straw," and its admission does not affect the merits of this case. To be libelous, the statements must be *false* and *malicious,* and must be of a character which the court or jury may say is such as naturally and reasonably tends to excite the wrath of the person so traduced, or deprive him of public confidence. If a citizen of average fair character finds himself pilloried in the public press as a litigious and quarrelsome neighbor, a man governed by spite and disloyal to the interests of the city or county where he lives, he must needs be either a profound philosopher or a human alligator if he be not stirred to wrath by the assault. And even if he have the grace and strength of character to bear it with equanimity, the natural and inevitable effect of such publication is to injuriously affect his hold upon the respect and confidence of the public. The authorities to this effect are so numerous and so unanimous that to attempt their collation would savor of pedantry. It was, therefore, error for the trial court to deny the plaintiff's right to go to the jury. I respectfully suggest that the law of libel has been too long and too thoroughly settled to justify the

court, at this late day, in attempting to reconstruct it and to overturn at a single sweep the long list of decisions which, until now, have had our unquestioning approval.

Though largely declaratory of the common law, it should not be overlooked that the subject is one of which the legislature has taken cognizance. The statute has had frequent judicial consideration, and its effect has been settled by practically unvarying construction. Its amendment or modification should be left to the authority which enacted it. The judgment here appealed from should be reversed.

PRESTON, J., concurs in this dissent.