STATE OF IOWA, Appellee, v. MARTHA M. HEPTONSTALL, Appellant.

No. 39429.

NOVEMBER 21, 1929.

*George J. Dugan,* for appellant.

*John Fletcher,* Attorney-general, and *Neill Garrett,* Assistant Attorney-general, for appellee.

KINDIG, J.—A grand jury of Dallas County indicted the defendant appellant, Martha M. Heptonstall, on January 10, 1928, for the offense of libel committed October 22, 1927, by  "willfully, knowingly, unlawfully, and maliciously defaming one Oscar F. Woods, by knowingly, willfully, and maliciously aiding and assisting in the making, publishing, and circulating publicly" of certain printed matter known in the record as Exhibit A.

After a conviction therefor by the jury in April, 1928, the district court, on May 12th thereafter, sentenced the appellant to pay a fine of $100 and costs.

Appellant is the wife of M. M. Heptonstall. Troubles and disputes growing out of the husband's connection with the Security Savings Bank, of Perry, Iowa, gave rise to the libelous publication aforesaid. In November, 1918, the Heptonstalls were living in Omaha, Nebraska, and, through an agent, J. L. Tennant, became interested in said bank. Negotiations followed, and finally resulted in the purchase of certain stock by Mr. Heptonstall in the Perry bank. Whereupon Heptonstall became president of the institution, and continued in that capacity until sometime in the year 1922, at which time he retired. From August 15, 1922, until January 10, 1923, Oscar F. Woods (named in the indictment as the person defamed) was president of that financial concern. The bank closed in 1925, and a receiver was appointed for liquidation purposes. As a result of Mr. Heptonstall's relationship with the institution, several indictments were returned against him. Upon the trial of one, he was acquitted by a jury, and upon the hearing in each of the others, the trial court directed a verdict of "not guilty." Woods, the party defamed, was instrumental in procuring the indictments. This engendered much strife and hard feeling among the late business associates.

Succeeding the trials on the indictments, Heptonstall left Iowa, and went to Sheffield, Alabama, where he was engaged in the chemical business. Apparently the appellant was also financially interested with him in that business venture. While the record does not appear to disclose that she had a personal investment in the Perry Bank, yet the appellant at all times took a great interest in its affairs, and sometimes attended stockholders' meetings in behalf of her husband. Distance in this instance did not seem to "lend enchantment or make the heart grow fonder," for the ill feeling continued until, on October 22, 1927, as before related, appellant caused to be circulated in Perry a printed pamphlet, purported to have been signed by M. M. Heptonstall, her husband. That document, known in the indictment and record as Exhibit A, contained, among others, the following statements:

"Heptonstall (The Villain).

"For five years I have kept silent. * * * It is now my turn to speak. * * * When those pigmy financial pirates failed in

their miserable, nefarious attempt to wreck us [appellant and her husband] financially, they attempted to cover their filth by blackening my character and wrecking us [appellant and her husband] socially. * * * I came to Perry in November, 1918, at the request of the Security Savings Bank of Perry, through their representative, J. L. Tennant, of Lake Work, Florida. He wired me to come immediately. I found the Security Bank had been ordered closed by George Messenger, then superintendent of banking in Iowa.

"Has Sidney Doidge or Oscar Wood [the person named in the indictment as defamed] or any of the rest of their gang ever made it known to you, that under their management the bank in November, 1918, had gone broke and been ordered closed, and that they sent for me at Omaha to come and use my efforts to have it opened again? That is just what happened. Did they ever tell you that I was a complete stranger at Perry, and that before I promised Mr. Messenger that I could keep it open, I called the directors together, and as a board we went over the notes in the bank and they signed a statement as to the quality of the notes, and as to about $75,000 of them it was absolutely false?

"Did they ever tell you that they represented the notes of:

"C. Durant Jones for about $10,000 without security.

"Wm. Graham for about $6,500 without security.

"F. B. Wood for about $4,900 without security.

"Ada Hindert for about $3,000 with security.

"L. D. Blue for about $8,500 without security, to be good and bankable, and these are just samples of the balance of trash they checked in on me as good. On the strength of that statement I bought stock in the Security Savings Bank and paid $135 per share cash for it. I later found out the truth: 'I was a stranger and they took me in.' One of the directors later admitted that he did it, but said he did it to keep the bank open and that he did not think I would buy on the strength of that statement. In the name of all decency was I not entitled to rely on the statement of bank directors as true?

"Did they ever tell you the real condition of the bank when I came in November, 1918? * * * They owed about $83,000 in borrowed money, about $50,000 in rediscounts, about $23,000 to the Federal Reserve Bank for bonds sent them which they had

sold, used the money, and could not pay for. That they only had about $6,000 cash to care for about $225,000 of depositors' accounts, and all of the above named obligations. Did they tell you that they had been refused further credit; that they had no funds in the Chicago or Des Moines banks, and could not get funds? Did they tell you that they were short $6,250 in Liberty bonds that were never found? Did they tell you that, relying on that false statement they signed, I went to Des Moines and personally raised $25,000 to keep the bank open, believing they had told the truth about those notes? * * * Did they tell you that while I was ill in bed they tried to bluff my wife out of our bank stock, and went so far as to tell her that she would take what they offered or they would send me to the penitentiary? * * * I make no claims to perfection, either as an individual or as a banker, and like all bankers, may have occasionally made an error in judgment, but they were honest mistakes. * * * And now at the end of five years, I can come to you, the thinking, fair-minded people of Perry, and you will be frank to admit that I have some justification in a trifle of pardonable satisfaction, that the gang who attempted to wreck me have reaped their reward. 'Their chickens came home to roost.' * * * In their attempt to rob me, they messed themselves up. * * *''

Throughout the pamphlet, including the unquoted portions, there are suggestions that Oscar Woods (the defamed) and others are hypocrites, cheats, defrauders, and falsifiers. Evidence was introduced by the defendant to prove the truth of the facts published, while the State, on the other hand, presented testimony showing the falsity thereof.

I. Contention is made by the appellant that the foregoing document, even if published and circulated by her, is not libelous *per se*, and that the trial court, therefore, erred in instructing the jury that it was. Libel is defined in the 1927 Code as follows:

"Sec. 13256. A libel is the malicious defamation of a person, made public by any printing, writing, sign, picture, representation, or effigy, tending to provoke him to wrath or expose him to public hatred, contempt, or ridicule, or to deprive him of the benefits of public confidence and social intercourse. * * *''

A careful and fair analysis of the publication reveals that Oscar Woods is accused of being a defrauder. Moreover, the clear result of the publication, including that part not quoted, is that Woods, through false pretenses, induced Heptonstall to buy stock in the bank. Likewise, in effect, it is said that Woods was a falsifier, a cheat, a hypocrite, and a liar. During our discussion in *Fey v. King*, 194 Iowa 835, we said:

"The crime of libel consists of two elements: (1) Malicious *defamation* of a person; (2) *publication* of such defamation * * *."

Both elements suggested in *Fey v. King* are present in the case at bar. Defamation, as defined in the *Fey* case, supra, "is an attack upon the reputation of another. 'Reputation' is also a broad and indefinite term; but in the law of libel, reference is had thereby in general to the integrity and moral character of the injured party." Such definition has been met in the publication under consideration.

Furthermore, the printed document is such as will tend, as required by the statute, "to provoke" Woods "to wrath or expose him to public hatred, contempt, or ridicule, or to deprive him of the benefits of public confidence and social intercourse." Our conclusion is that the publication was libelous *per se*. See *Morse v. Times-Republican Ptg. Co.*, 124 Iowa 707; *State v. Cooper*, 138 Iowa 516; *Fey v. King*, supra (194 Iowa 835).

II. Continuing her objections at this point, the appellant urges that, even though the foregoing be true, nevertheless the court should not have so instructed the jury, because in cases  of criminal libel it is for the jury, and not the court, to construe the law. Section 13262 of the 1927 Code contains the following upon that subject:

"In all prosecutions for libel, the jury, after having received the direction of the court, shall have the right to determine at its discretion the law and the fact."

Significant is that portion of the legislation which contemplates "the direction of the court." Notwithstanding that the jury is to determine "the law and the fact," the court is to direct. Repeatedly in its instructions at the present trial, the

court made it very plain to the jury that they were to determine both the law and the facts. Everything it said was in the nature of advice. No error appears in this regard. Approval of such an instruction on the part of the trial court was made in *State v. Sterman*, 199 Iowa 569, wherein the court suggests:

"Complaint is made of Instruction No. 7, on the ground that the court stated that: 'In the judgment of the court, said paper, Exhibit A, is in and of itself libelous,—that is, it contains statements and charges made against a person which are libelous in and of themselves.' In the same instruction, and in the same sentence, the court told the jury that it was for them to determine whether Exhibit A had been written and circulated by defendant. The complaint is without merit. It was the duty of the trial court to inform the jury that the matters contained in Exhibit A were libelous *per se*. *State v. Cooper*, 138 Iowa 516."

III. An additional ground for reversal suggested by the appellant is that the evidence did not sustain her conviction. Primarily, appellant's thought at this juncture is that there is  no evidence to support the allegation in the indictment that she made the publication. Notation is here made that regarding this the indictment alleges the appellant assisted "in making, publishing, and circulating" the pamphlet under consideration. There is ample evidence that appellant published and circulated the written matter. She hired two boys, Marshall and Ebbert Munko, at Perry, to make the distribution, and paid them $1.50 apiece for doing the work. These little boys scattered the publications all over Perry, by leaving them at the dwelling houses and business places. Each boy so testified. Support for their evidence in this regard can be found in the testimony of their mother, Mrs. Alta Munko, who said:

"Mrs. M. M. Heptonstall [appellant] asked my boys [Marshall and Ebbert] to deliver this pamphlet, Exhibit A, for Mr. Heptonstall. Mrs. Heptonstall paid them for the distribution of the pamphlets. My boys distributed these pamphlets. * * * They worked at it Friday night after school and Saturday until noon, October 21st and 22nd, 1927."

Hence, so far as the publication and circulation are concerned, the proof is ample to sustain the jury's verdict.

IV. Complaint is also made by appellant that the record fails to sustain the allegation in the indictment that she aided in making the defamatory pamphlet, even though she did circu-  late it. Mr. Heptonstall, appellant's husband, testified that he composed the article, had it printed outside of the state, and sent it by express to appellant at Perry. Resultantly it is argued there is no evidence to support the declaration in the indictment that appellant assisted in making the pamphlet.

So far as direct evidence is concerned, this may be true; yet there are facts and circumstances worthy of consideration. Mrs. Heptonstall, the appellant, as before suggested, assisted her husband with his previous bank affairs, and at this time she is financially concerned in the chemical business at Sheffield, Alabama. At several places within the pamphlet the word "us" is used in a way to signify both appellant and her husband.

One defense relied upon by appellant was justification. Evidence was introduced accordingly. Basis therefor was that certain persons in Perry, Iowa, sent derogatory communications to Sheffield, Alabama, for the purpose of injuring the chemical business of the Heptonstalls at the last-named place. Completing the contention of justification, appellant, through her husband, as a witness, explains that the purpose of the pamphlet was to quiet the gossip, rumors, and talk in Perry, so that it would not overflow into Sheffield, Alabama. Thus the issue was submitted to the jury, under the court's instructions. Some significance must be given, then, to the fact that appellant took a special interest in the business at Perry, and had knowledge of the communications from the latter place to Sheffield, Alabama.

Assuming, however, without deciding, that such proof is not sufficient, it is apparent that, under the indictment based upon the statute aforesaid, it was unnecessary to prove both that appellant aided in making, and circulated, the pamphlet. Several acts are enumerated in the statute as sufficient to constitute libel. They are stated disjunctively. For instance, Section 13257 provides:

"Every person who makes * * * or who willfully publishes * * * or in any way knowingly or willfully aids or assists in making, publishing, or circulating * * *."

In *State v. Des Moines Union R. Co.,* 137 Iowa 570, we declared:

"[page 572]. The doctrine is firmly established in this state and elsewhere that, when several acts are enumerated disjunctively as constituting an offense, and are not repugnant to each other, they may be alleged conjunctively in an indictment, without duplicity."

The aggregate result accruing from the conjunctive statement of the disjunctive elements is but one offense,—libel. On the other hand, the effect of stating a single disjunctive element is a complete offense. Consequently, it is not necessary to prove each disjunctive. If the evidence sustains one, it is enough. Authority for this pronouncement may be found in the following cases: *State v. Myers,* 10 Iowa 448; *State v. Cooster,* 10 Iowa 453; *State v. Harris,* 11 Iowa 414. We find this statement on page 454 of the *Cooster* case:

"It has been held by very good authority, even under the old practice, whose rigid rules are intended to be relaxed by one system of procedure, that, when a statute contains several things in the alternative, you may, without multifariousness, indict for the whole conjointly; still the prosecution would not be required to support and cover all the alternative charges with his proof, but only so much as would show that an offense had been committed in some of the ways specified."

Necessarily, then, the evidence supports the indictment for libel.

V. Objection is made by appellant because the trial court excluded certain testimony.

(1) Grievance is based on the ground that M. M. Heptonstall and other witnesses were not permitted to detail the condition of the Perry bank, either at the time when the stock was

 bought or afterwards. The purpose of this was to show the truth of the pamphlet's contents. Apparently these witnesses were allowed to testify upon this subject, so far as material. Exclusion was made of proffered evidence relating to matters and things not referred to in the libelous document. Irrelevancy and immateriality of the testimony offered therefor justified the court's action. As above stated, the material and relevant evidence concerning this proposition was admitted.

(2) Certain letters, it is alleged, had been circulated at Sheffield, Alabama, derogatory to appellant's husband. It is said the publicity arising therefrom was injurious to the chemical business conducted at that place by appellant and her husband. And continuing the theory, claim is made that the pamphlet was published in Perry for the purpose of discontinuing the circularization of untruths in Sheffield, Alabama. To elucidate, appellant maintains that the source of the circular letters coming to Sheffield, Alabama, was Perry, Iowa. Therefore, proof was offered concerning the source and contents of the letters. Said proof, however, was in the nature of hearsay and the statement of rumors which did not show that Oscar Woods, the defamed, was the author or circulator thereof. No error appears, therefore.

Wherefore, the judgment of the district court is affirmed.—*Affirmed.*

ALBERT, C. J., and EVANS, FAVILLE, and GRIMM, JJ., concur.