STATE OF IOWA, Appellee, v. MARIE MAHARRAS, Appellant.

No. 38700.

128

APRIL 5, 1929.

*J. C. Murtagh* and *Sullivan & Sullivan,* for appellant.

*John Fletcher,* Attorney-general, *Neill Garrett,* Assistant Attorney-general, and *Frank W. Edwards,* County Attorney, for appellee.

DE GRAFF, J.—On the morning of August 7, 1924, the defendant, Marie Maharras, threw, or caused to be thrown, her six-year-old stepson into the Cedar River, resulting in the death of the boy by drowning. There can be no question about this. The facts prove it, and the defendant admitted the commission of the act, although, at the particular moment after committing the act, she did not stop to learn whether the boy was drowned or not. She immediately went to her sister's home, and told her sister what she had done. The sister immediately notified the police officers, who went to the scene; and at that time defendant

stated to the officers that she intended to push the boy into the water, and that she intended to drown him. She also took the officers to the place where the act was committed. She said she realized what she was doing, and knew that it was a crime and a violation of the law, and expected the officers to come to get her, and expected that the State would hang her for committing the act. The evidence also shows that she had a motive for committing the act, as she disliked the boy and considered that he was a source of trouble to her and always in the way.

Upon the trial of this case, there were called on behalf of the defendant certain psychiatrists and psychologists, in an attempt to prove the fact of her insanity. One expert said, upon his first examination, that he thought she was a feeble-minded person; but upon a later examination, he admitted his mistake, and said she was not feeble-minded, for the reason that, "Once feeble-minded, always feeble-minded." These experts classified her as a high-grade moron, a middle-grade moron; and another, that she was a type known as a maniac depressive psychosis. There was evidence offered on behalf of the State that she was a sane person. This presented a fact question, and the jury decided that she was sane; and we are not inclined to disturb this finding, under the evidence. The psychologists and sociologists may study the underlying causes of crime; the psychiatrists may offer their theories in penology, and attempt to answer the question, "How can society be better protected from antisocial and criminal persons who disturb the peace and harmony of society?" What they offer is mere theory, based, of course, upon their experience and study of the subject of mental abnormality; but when any one of them is called as a witness, he usually makes answer to a hypothetical question. We have not reached the point in the administration of the criminal law that we can adopt the theory of the eminent Clarence Darrow, wherein he denies the right to punish, and asserts the utter futility of punishment of the criminal. Under his philosophy, a criminal is a mere "chip on the wave"—the impotent victim of economic determinism. Under such doctrine, the State is subordinated to the individual, which is not the fundamental principle of criminal law, or of its administration.

We are not to be understood that we disregard the dictates of humanity and its merciful tendencies to protect the "insane."

The result of the forces and of the facts offered in support thereof, as in the instant case, is simply that great care must be taken to maintain and preserve law and order, to the end that human life shall be made safe. This court, speaking through Kindig, Justice, said, in *State v. Buck,* 205 Iowa 1028, 1. c. 1039:

"At this point, the troublesome question is to discover a criterion which will serve, under our present state of civilization, as a just standard, to determine the status of the mind which is to be held responsible for crime. No human method of so doing can be perfect, and all schemes devised to measure the mentality doubtless will not always be exact. The safest course in jurisprudence seems to be that which experience reveals as the soundest and most practical, and the 'comprehension and consequence rule' appears more nearly to meet this test. That principle has been followed by a majority of the courts * * *."

That rule simply means that the jury should be told, in substance, that, if the defendant's act in taking the life of a person was caused by mental disease or unsoundness which would dethrone his reason and judgment with respect to that act, thereby destroying his power rationally to comprehend the nature and consequences of that act,—that is, his ability to know and distinguish right from wrong,—then he is not amenable to punishment. On the other hand, if the jury believe, from all the evidence and circumstances, that the defendant was in possession of a rational intellect and sound mind, but allowed his passions to escape control, then he cannot claim for such act protection on a plea of insanity.

It is elementary that, when insanity is urged as a defense, the burden of proof is upon the defendant to establish, by preponderance of evidence, his or her insanity at the time of the killing. *State v. Thiele,* 119 Iowa 659. It is also fundamental that insanity is a question of fact, to be determined by the jury, under the rules of law, and as found in the precedents of the particular jurisdiction. As bearing on this proposition, see *State v. Felter,* 25 Iowa 67; *State v. Wegener,* 180 Iowa 102; *State v. Cooper,* 195 Iowa 258; *State v. Murphy,* 205 Iowa 1130.

In the case at bar, the elementary principle of the credibility

of witnesses and the weight to be given their testimony finds especial application, and it may be further observed that opinion  evidence is the lowest grade of evidence; and it is primarily upon this class of evidence that the defendant bases her case. It is also to be observed that a nonexpert, testifying to insanity, before he is permitted to express an opinion on that point, must be able to say something that the particular person has said or done which fairly tends to show insanity. *State v. Kilduff*, 160 Iowa 388; *State v. Maupin*, 196 Iowa 904. This rule is applicable to the testimony of one Ralph Davis, a witness for the State in the instant case. This witness had never seen the woman before the time of the commission of the act by the defendant. The trial court did finally permit the witness to give his impression of the defendant, and he stated that she appeared to him to be in a daze, and, being asked what he meant by that, said: ''She acted like to me she didn't know just what was going on.'' The court, however, did not permit the defendant to cross-examine the witness as to his opinion as to whether she was sane or insane. There was no error here.

It is also urged by the appellant, with considerable emphasis, that the trial court erred in permitting a certain exhibit known as Exhibit A to be offered in evidence. This exhibit was a type-written transcript of the questions asked the defendant and her answers immediately after the crime was committed. The questions and answers were taken in shorthand and transcribed by Miss Lulu Smith, who was a witness called on behalf of the State. Miss Smith identified the copy which was introduced, and stated that it was an identical copy of the original, and that it was a carbon made at the same time the original was typed, which original was signed by the defendant. There can be no question that this was a duplicate and exact copy of the typewritten statement. The court at first refused to admit this particular exhibit, which had been placed in the hands of Miss Smith on the witness stand. Upon further examination, however, Miss Smith detailed into the record the admissions and statements by the defendant as to how the tragedy occurred. Upon cross-examination, she was asked how she could identify the copy Exhibit A, and she answered by stating that she knew her own typewrit-

ing, and further that she could have testified about these facts without referring at all to the typewritten transcript, and that she remembered substantially all that was said, without aid of the exhibit.

"Q. You are not testifying from your recollection of the answers and questions given at that time, but you are testifying from what is given on that paper,—is that true? A. I can testify either way, with the paper or without. Q. Why did you use the paper, then? A. Because it was handed to me. Q. You didn't need it, did you? A. No. I don't think I did. Q. You could have recalled the questions and answers without the paper, couldn't you? A. Yes, sir."

It is shown that the answers given by the defendant were voluntary statements, and that there was no duress or inducement offered to the defendant to answer these questions. There were no threats used, nor was she compelled in any manner to answer these questions. Under the circumstances, we hold that there was no prejudice whatever in permitting Exhibit A to be introduced in evidence.

In the consideration of all the evidence bearing on the insanity of the defendant, it must be kept in mind that the question in issue was whether or not the defendant was insane at the time of the commission of the offense, to wit, August 7, 1924. The statement Exhibit A was taken within a few hours after the offense was committed, and it was with reference to that date that the jury determined whether she was sane or insane. The jury said, "sane."

The complaint is also made that the trial court did not permit certain of the defendant's witnesses to answer as to the sanity or insanity of the defendant. The basis of the ruling is that the questions asked are not definite as to time, and ask for the opinion of the witness upon a subject without showing that the witness was qualified to testify, under the rule announced in *State v. Kilduff*, supra. Other rulings on the admission of evidence are made the basis of complaint, but we will not incumber this opinion by a recital of the questions and objections thereto. Sufficient to state that all of these objections fall with the precedents herein cited. We discover no error in the rulings made by the court.

In passing, it may be said that no mental test or examination of this defendant was made at or near the time of the commission of this crime. The first examination was made by a psychologist or psychiatrist three months after the act charged in the indictment, and his analysis and examination are not in the record before us. The next examination was made nearly six months after the commission of the act, and the expert who made that examination admitted on the witness stand that he was wrong in saying that she was feeble-minded. The next examination was made in March, 1926, and from that examination the defendant was pronounced sane, and was discharged from the institution in which she was then confined.

We conclude, therefore, that there is no legal reason why this defendant should be relieved from the judgment entered by the trial court upon the verdict of the jury.

The judgment is—*Affirmed.*

ALBERT, C. J., and STEVENS, MORLING, and WAGNER, JJ., concur.