STATE OF IOWA, appellee, v. EDWARD JAMES BECKWITH, appellant.

No. 47669.

(Reported in 46 N.W.2d 20)

FEBRUARY 6, 1951.

W. L. Beecher, of Waterloo, and E. W. Ruppelt, of Grundy Center, for appellant.

Robert L. Larson, Attorney General, Don Hise, First Assistant Attorney General, B. K. Willoughby, County Attorney for Grundy County, and Robert R. Buckmaster, of Waterloo, for appellee.

THOMPSON, J.—The defendant was charged, by county attorney's information, with the murder of Irma Jean Stahlhut, committed on or about June 22, 1949, in Grundy County, Iowa. A change of venue was granted, and the cause was tried in the District Court of Black Hawk County.

Irma Jean Stahlhut and her husband, Harvey Stahlhut, operated a tavern in the small town of Morrison in Grundy County. They were married in 1947 and were the parents of one son who was seventeen months old at the time of the trial. Harvey Stahlhut had other employment, which took him away from the tavern a part of the time, so that its operation fell considerably upon his wife, with some intermittent outside help. The defendant lived at Morrison, and apparently upon occasion had rendered some aid in the operation of the Stahlhut tavern. He was married, but his wife had left him and refused to return or to live with him. He was twenty-eight years of age on June 22, 1949.

Irma Jean Stahlhut was in charge of the tavern on the evening of June 22, 1949. There were customers as late as 11:45, and the defendant had spent much of the evening there. Harvey Stahlhut returned to the tavern, in the rear of which the couple and their baby son lived, about 12:25 on the morning of June

23. He did not see his wife, went to bed about 12:40, and upon awakening about 3:45 and finding her still missing, made a search of the tavern and found her horribly mutilated body in the "walk-in" cooler.

The crime was a particularly brutal and revolting one, but there can be no real doubt that a jury question is involved, and no good purpose would be served by further details. Defendant, as a witness in his own behalf, admitted his presence in the tavern, that he followed Irma Jean Stahlhut into the cooler, and that he stabbed her there. He denies the mutilation of her body, and defends upon the grounds of insanity and intoxication. Upon this appeal various legal questions are presented which are discussed in the opinion.

I. Defendant's first assignment of error is based upon the court's denial of challenges for cause to four jurors on voir dire. Section 779.5, Codes 1946 and 1950, contains the applicable ground for challenges for cause involved here: "11. Having formed or expressed such an opinion as to the guilt or innocence of the prisoner as would prevent him from rendering a true verdict upon the evidence submitted on the trial."

██ Some well-established principles are applicable to the situation existing here. The trial court has a large, but not unlimited, discretion in allowing or disallowing challenges for cause in criminal cases. State v. Rhodes, 227 Iowa 332, 340, 288 N.W. 98; State v. Reed, 205 Iowa 858, 859, 216 N.W. 759. Likewise, it is settled law that if a disqualified juror is left upon the jury in the face of a proper challenge for cause so that defendant must either use one of his peremptory challenges or permit the juror to sit, and if defendant does use all of his peremptory challenges, prejudice will be presumed. State v. Reed, 201 Iowa 1352, 1354, 208 N.W. 308. Defendant should not be compelled to use his peremptory challenges upon prospective jurors who should have been excused for cause.

██ The jurors as to whom defendant's challenges for cause were denied by the court were Robert Pierce, Harry Moon, Clyde L. Border, and Thelma Stimson. Pierce was the subject of the State's first peremptory challenge. Clearly, no prejudice resulted to the defendant, even if error were present in the trial court's ruling on the challenge to this juror for cause. The juror Thelma

Stimson was in our opinion sufficiently, if not abundantly, qualified upon her voir dire. It remains to consider the record with reference to Harry Moon and Clyde L. Border.

The juror Moon at first said that he had an opinion at the time:

"I would decide the case solely on the facts but I believe I am prejudiced now. I don't exactly know whether he is guilty or innocent. I could decide the case solely on the evidence and put the opinion I now have out of my mind and I would do that."

Later, this occurred:

"If the evidence warranted it I believe I would be just and fair on it. I do have an opinion now and I now am prejudiced. I think I would be fair if the facts were presented. Q. Do you think you could set aside that opinion and prejudice? A. Probably not entirely. I think I would start out with the idea that the defendant was guilty and maintain that idea until evidence was introduced to show otherwise. I don't know as it would have anything to do with the kind of verdict I would render if the facts were there. I think I would act on the facts fairly and squarely. It might have an unconscious influence."

The court then took over the examination of the juror, eliciting the following:

"The Court: And you understand that if you are chosen as a member of the jury in this case you will have to determine the matter solely upon the evidence you hear from the witness stand and under the instructions of the court? A. I understand that, sir. The Court: Notwithstanding any opinion or prejudices that you have? A. Yes. The Court: Can you do that? A. I can. The Court: And you will? A. Yes. The Court: The challenge is overruled."

But after this, the record shows that the examination of the juror closed with the following statement:

"I think it would be difficult for me to acquit, yes. The attitude I now have might have some influence upon my verdict. I still say I would be fair about it and go by what the evidence warranted. *With the opinion I have now it would be difficult*

*for me to acquit even though the evidence warranted it."* (Italics supplied.)

The challenge for cause was renewed and again denied. Defendant removed the juror by the exercise of one of his peremptory challenges.

The record upon the voir dire examination of the prospective juror Clyde L. Border shows:

"I have some actual knowledge of the facts in this case. I have my opinion on it anyhow. I do not have any actual knowledge. I read the newspapers and heard quite a lot on the radio and quite a lot else. The people that lived at Morrison and owned the tavern there are very good friends of my next door neighbor and we have talked about it different times after it happened. I have seen the Stahlhuts different times. I am not acquainted with them, only by seeing them is all. By talking with my neighbors I have formed an opinion as to the guilt or innocence of the defendant. I don't know the defendant. I have heard of him. I don't know that the defendant committed this crime, but I have an opinion as to whether he did or not. I think I have an opinion as to whether he was sane or insane. I couldn't be positive, I have no actual knowledge. It would be hard for me to put the opinion I now have aside and decide this case solely on the evidence. I could do it. I'll say there would have to be a lot of evidence. If I took the oath I could decide this case on the evidence. I would have to.

"I have the opinion now. It would be hard for me to discard that opinion entirely if I were selected as a juror in this case. Of all the evidence that I have heard, and everything, I don't think I could be a juror in this case. I think that what I have heard might influence me in my verdict even though I tried not to let it do so."

The court then examined:

"Well, you understand that if you were selected as—to sit as a juror in this case you take an oath and you are to arrive at your verdict solely upon the evidence that you hear in the courtroom or the exhibits that are introduced? A. Yes, sir. The Court: And accordingly apply those facts according to the law

as the court gives it to you in the instructions? A. Yes. The Court: You understand that? A. Yes. The Court: Notwithstanding any prejudice or opinion that you might now have. Can you do that? A. Yes, I can do it. The Court: Will you do it? A. Yes. The Court: Challenge is overruled."

Upon further examination the juror said: "I think I would unconsciously be influenced by the opinion I have now." The challenge was renewed and the trial court examined further:

"You just told this court a few minutes ago that notwithstanding any opinion or prejudice which you now have that you could and would, if selected as a juror, determine or arrive at a verdict solely on the evidence introduced in this case, evidence and exhibits, and in accordance with the instructions of the court. Now do you wish to change your answers? Your prior answers? A. Well, I don't believe I could give a fair verdict. The Court: You understand that all the time you have been on the witness stand there you have been under oath? A. Yes. The Court: And you want to tell the court now that you didn't correctly inform him when he previously asked you about what you could do? A. No. The Court: Well then notwithstanding your prejudice or opinion that you might have now, can you and will you, if selected as a juror, determine it solely upon the evidence introduced and the instructions of the court? A. Yes, I will. The Court: Challenge is overruled."

Court having adjourned at this time, the juror was further examined the next morning, when he said: "I read the newspapers in regard to this transaction and discussed it with friends and had formed an opinion at that time. I don't have an opinion now as to the innocence or guilt of the defendant."

The defendant removed the juror by the exercise of a peremptory challenge.

We reviewed the law and the authorities exhaustively in State v. Rhodes, supra, and it is not required that we again analyze each of the numerous Iowa cases which have dealt with various phases of the examination of and challenge to prospective jurors in causes involving criminal charges. The Rhodes case holds that an opinion formed from hearsay, from reports from

or communications with sources who do not pretend to have personal knowledge of the facts, and which the juror says could be readily set aside if it developed that the asserted facts were not correct, does not disqualify the juror; or, perhaps, that it is within the discretion of the trial court to find that it does not. But even such an opinion, formed upon hearsay, should disqualify if it appears to be fixed and that upon the whole record of the examination of the juror, the conclusion must be reached that his opinion, however formed, would in all probability affect and influence his verdict.

It is true that where an act has been done which arouses a community, which "startles and attracts the public mind" (see State v. Lawrence, 38 Iowa 51), the citizen who has not heard of it, and who has not formed some sort of idea as to what happened, or as to the merits in some manner, is either ignorant or uninformed to a degree which makes his desirability as a juror seriously to be doubted. In the instant case, it would have been unusual if the prospective jurors had not heard many reports of the case, and if they had not formed some sort of opinion as to what actually transpired. The most that could be expected of them was that they should be able to lay aside their conclusions and give both the State and the defendant the benefit of their impartial consideration of the evidence. But this much the parties had a right to expect; in fact, to demand. We find that the situation as to each of the jurors Moon and Border was such as to require the granting of the challenge for cause.

The final answer of the juror Moon was:

"I think it would be difficult for me to acquit, yes. The attitude I now have might have some influence upon my verdict. I still say I would be fair about it and go by what the evidence warranted. With the opinion I have now it would be difficult for me to acquit even though the evidence warranted it."

We know of no case in Iowa where a statement such as this has been held not to disqualify a juror.

A somewhat different situation is found in regard to the juror Border. After he had said that the "people who owned the tavern at Morrison" (presumably the deceased and her husband)

were very good friends of the juror's next door neighbor, and that he had talked about it with the neighbor "different times after it happened," he expressed the belief that it would be hard for him to put the opinion he had aside; that what he heard might influence him in his verdict even though he tried not to let it do so. As usual in these matters, he also said that he could try the case solely upon the evidence. The juror is usually not an even match for the attorneys in an examination of this sort, and too often the pulling and hauling which ensues results in an expression from the confused prospect that he has an opinion which would affect his verdict, and a counterexpression that it would not. It is from the whole examination that the final conclusion must be reached; the sum of the answers made must be evaluated, and the real state of mind of the juror determined.

The trial court took an active part in the examination of this juror. His examination has been set out above. He succeeded in eliciting statements that the juror would arrive at a verdict solely upon the evidence and the instructions. The effect of these answers, however, is much weakened by the fact that the court first instructed the juror that it would be his duty to do just that. Upon further examination by counsel the juror retreated toward his initial position, saying that he thought he could not disregard the opinions he had formed and be fair and impartial, and that he would be unconsciously influenced by those opinions. Here the court again examined, recalling to the witness that he had just told the court that he could arrive at a verdict uninfluenced by previous ideas. The juror's first answer to the court was: "Well, I don't believe I could give a fair verdict." But upon being reminded by the court: "You understand that all the time you have been on the witness stand there you have been under oath?" coupled with the question, "And you want to tell the court now that you didn't correctly inform him when he previously asked you about what you could do?" the juror once more decided that he could lay aside his opinion and try the case fairly, and the challenge for cause was overruled.

We said in State v. John, 124 Iowa 230, 237, 100 N.W. 193, 196:

"That these jurors had fixed and unqualified opinions, such as disqualified them from service as jurors, there can be no doubt. They insisted upon their opinions as persistently as due courtesy to the court would permit, and finally yielded a reluctant concession that they could deal with defendant justly."

The quotation seems to be applicable here. It no doubt did not occur to the trial court that his examination and re-examination of the juror Border were not calculated to find the ultimate fact as to whether he could serve fairly; but it seems to us that the effect was to put a considerable degree of pressure upon the juror to make the answers that would show him qualified. He was first advised of his duty to be fair and impartial and to decide the case upon the evidence and the instructions, and then asked, in effect, if he would do his duty. When he wavered from this position upon further examination by counsel, the court again took the matter in hand, reminded the juror of his previous answers to the court, that he was at all times under oath, and asked if he wanted to change his former answers. Under the circumstances, it is not strange that he again said he could put aside his opinion and be fair and decide upon the evidence adduced.

As is so often found in the law, while precedents are helpful each case usually depends upon its own facts, which are as varied as the nature of human activities. Here, it seems abundantly clear from the entire record that the challenges to the jurors Moon and Border should each have been sustained.

We have said, and have repeated it often, that trial courts should use the utmost caution in overruling challenges for cause in criminal cases when there appears to be a fair question as to their soundness. Although this admonition has been too often disregarded, we again call attention to the language in State v. Teale, 154 Iowa 677, 682, 135 N.W. 408, 410, wherein we said:

"We are constrained to say in this connection, however, that we see no occasion in the ordinary administration of the criminal law in this state for the close rulings on the qualifications of jurors that are constantly brought to our attention. Although a ruling may be technically right, if it must be so

doubtful as to raise a fair question as to its correctness, it is far better to give the accused the benefit of the doubt, to the end that he and all other men may be satisfied that his rights have not been invaded. Confidence in the fairness and impartiality of each member of a jury, which shall be sworn to try a man on a charge involving his life or liberty, is of the greatest importance to the welfare of the state. Indeed, it is of such paramount importance to every citizen that the time and expense necessary to secure jurors as to whom no doubt may rightly exist is an insignificant consideration."

With the high level of literacy and intelligence existing among the citizens of Iowa, making many well-qualified jurors available, it should not be necessary for trial courts to skirt the brink of error in the selection of trial jurors. We find that prejudicial error appears at this point.

II. Further error is predicated by the defendant, in his second assignment, upon the giving of instruction No. 16. This is the instruction which deals with the purported confession of the defendant, and is herewith set out in full:

"A purported confession of the defendant, Exhibit 36, has been received in evidence. You are instructed that before you can give any consideration to such exhibit you must first be satisfied beyond a reasonable doubt that the defendant signed said exhibit freely and voluntarily, without promises, inducements, threats, violence or putting in fear, and with full knowledge of its contents.

"You are further instructed that a confession which purports to be freely given is prima facie voluntary. The burden is upon the defendant to show, by a preponderance of the credible evidence, that such confession was procured by coercion or inducement or without his full knowledge of its contents, if such presumption is not to prevail."

It will be noticed that the instruction first places the burden upon the State to show beyond a reasonable doubt that the alleged confession, Exhibit 36, was signed "freely and voluntarily, without promises, inducements, threats, violence or putting in fear, *and with full knowledge of its contents*." (Italics supplied.)

This follows the rule laid down in State v. Johnson, 241 Iowa 135, 39 N.W.2d 123. Here it was held by a divided court that the burden is upon the State to show that an offered confession is "voluntary."

The trial court then followed with the second paragraph as set forth above, in which a different rule is laid down, when the confession "purports" to be freely given. In such case, said the court, the burden is upon the defendant to show by a preponderance of the credible evidence that such confession was procured by "coercion or inducement or without his full knowledge of its contents, if such presumption is not to prevail." The State urges that this is merely a shifting of the burden of going ahead with the evidence, and cites cases in which the defendant attempted to assert and prove an affirmative defense. State v. Buck, 205 Iowa 1028, 219 N.W. 17; State v. O'Brien, 188 Iowa 165, 175 N.W. 769. They are not in point. There is no question of an affirmative defense here. The court, in one instruction, gave the jury two different rules concerning the burden of proof. It appears that the opinion in State v. Johnson, supra, was first published on October 19, 1949, the same day upon which the trial commenced in the case at bar. Obviously, the court had a very limited opportunity, if any, to study the Johnson case; but this, of course, does not change the law. The State concedes that, if the confession did not on its face "purport" to be voluntary, by which we understand it to refer to the language in the instrument reciting "I now make the following voluntary statement" and "I have been advised of my rights of legal counsel and no threats or promises have been made to me," the burden then would be upon the State to establish that it was made voluntarily, under the rule in the Johnson case. But there was at least an equally strong recital in the Johnson case.

The Johnson case is the latest pronouncement upon the subject in Iowa, but were it not for the inclusion of the words in the first paragraph of instruction No. 16 "and with full knowledge of its contents," and of the similar words in the second paragraph "or without his full knowledge" we would find no prejudicial error here, whether or not the Johnson case is to be followed. The placing of the burden of proof upon the question of voluntariness, under the record, is not of importance, nor

could error be based upon it. The defendant testified fully as to the confession and the circumstances surrounding it, and his version as to the matter of promises, inducements, threats or putting in fear in no material way differs from that of the State's witnesses. It is, in effect, a concession that no promises or threats were made to him. We are aware that defendant testified that the state agent, Max Studer, told him "he wasn't going to beat me or abuse me, he wanted me to tell what happened and not to leave anything out." This cannot be construed as a promise of leniency if a confession is made, or a threat of punishment if it is not. It was a commendable reassurance, advising the defendant that he would not be mistreated.

We held in State v. Wilson, 152 Iowa 529, 132 N.W. 820, that an instruction, technically erroneous as placing an undue burden upon a defendant, may be without prejudice where there is no evidence on the part of the defense rebutting the State's showing. Here there was not only no evidence denying the State's testimony as to the lack of promises or threats, but the defendant himself confirms the State's witnesses on the point. An instruction, wrong in some cases, may be correct, or at least without prejudice, in others. See State v. Buck, supra.

But, although we might be inclined for the reasons given above to hold that the instruction did not prejudice defendant's rights, in so far as it refers to promises, inducements, threats, violence or putting in fear, we cannot uphold that part which told the jury that the burden was upon the defendant to show, by a preponderance of the evidence, that the alleged confession was procured "without his full knowledge of its contents." The trial court here confused proof of the voluntary nature of the confession with proof of the making of the confession itself. Wigmore on Evidence says in volume III, section 831, page 261, that the question of whether a confession is voluntary is almost always translated into whether it was induced by a promise, a fear or a hope, or other inducement calculated to induce a confession irrespective of its truth or falsity. Again he says on pages 331, 332, section 853: "The exclusion of a confession necessarily assumes (1) that the inducement, if it operated at all, was likely to produce a false confession, and (2) that it did in fact operate upon the mind of the person."

242

The rules as to admissibility of confessions, discussed in State v. Johnson, supra, and nearly all other cases, are concerned with the question, as Wigmore says, as to whether they are voluntary, that is, induced by hope or fear. In the case at bar the defendant, while admitting his signature to the purported confession, says he did not admit many of the material parts thereof; in other words, that much of the confession as offered and admitted in evidence is not his confession. Bearing directly upon this point is the following quotation: "A confession cannot be received in evidence or read or stated to the jury unless there is proof of the making of the confession. *This proof is separate and distinct from evidence as to the voluntary character of the confession made.*" (Italics supplied.) Underhill's Criminal Evidence, Fourth Ed., section 278, page 550.

In State v. Hersh, Mo., 296 S.W. 433, 436, the Missouri Supreme Court said: "While the jury would have been justified in finding that he made and signed the confession, yet the instruction assumed the making as an admitted fact, *when the burden rested on the state to prove that he made it.*" (Italics supplied.)

To the same effect is People v. Hegovic, 348 Ill. 58, 180 N.E. 561. The real contention in this case was not that the confession was not voluntary in the accepted sense, but that the defendant did not make many of the admissions of fact contained therein, did not know they were included in the paper he signed, and that they were in fact not true. One of defendant's exceptions to instruction No. 16 alleges that it was erroneous and prejudicial to the defendant in that it placed an undue burden upon him. It seems elementary that the burden must rest upon the prosecution to prove the making of a confession, as distinguished from its voluntariness, beyond a reasonable doubt. Instruction No. 16 did this in the first paragraph, but changed the rule in the second. Defendant has just cause for complaint here.

III. We have held above that the burden should have been placed definitely and squarely upon the State to prove the making of the confession, which of course implies knowledge of its contents. In a further assignment of error, defendant asserts that the confession should not have been admitted into evidence.

Much of our discussion in Division II is applicable here. Not only is there no evidence that the confession is involuntary but defendant's own testimony, strongly supports the conclusion that it was voluntary. His counsel argue that it should not have been admitted because he says he did not read it over and it was not read to him. But he testifies that it was dictated in his presence and hearing; that it was handed to him and that he had an opportunity to read it. The dictation must have apprised him of its contents, if he did not choose to read it over. The question was for the jury to determine. There is no merit in this contention.

IV. Defendant excepted to instruction No. 21 for the reason that, as he thinks, there was no evidence to sustain a finding that the defendant before he became intoxicated formed an intent to kill Irma Jean Stahlhut. There was such evidence. The jury might have found it in the alleged confession, Exhibit 36, in the testimony of Dr. Andrew H. Woods, and surely in that of Dr. Wilbur R. Miller, who said: "The defendant stated to us that he had taken the knife with the intention of forcing Irma Jean Stahlhut to have sexual relations with him and using the knife if necessary."

V. Defendant's fifth assignment of error is based upon a claimed defect in instruction No. 20. We set out the material part herewith:

"You are further instructed that if the defendant's act in killing Irma Jean Stahlhut, if he did kill her, was caused by mental disease or unsoundness, which dethroned his reason and judgment with respect to the act, which destroyed his power rationally to comprehend the nature and consequence of that act, and which, overpowering his will, irresistibly forced him to its commission, then he is not amenable to legal punishment and your verdict should be not guilty. But, if you believe from all the evidence and circumstances that the defendant was in the possession of a rational intellect or sound mind, and allowed his passions to escape control, then, though passion may, for the time being have driven reason from her seat and usurped it, and have urged the defendant with a force at the moment irresistible to desperate acts, he cannot claim for such acts the protection of insanity."

The particular fault which is found with the instruction is that the court used the word "and" immediately before the word "which" in the first sentence set out above, when "or" should have been inserted. Thus, the court told the jury in effect that in order to establish the defense of insanity it was necessary for them to find that defendant had a mental disease or unsoundness "which dethroned his reason and judgment with respect to the act, which destroyed his power rationally to comprehend the nature and consequence of that act, *and* which, overpowering his will, irresistibly forced him to its commission." (Italics supplied.) It will be noticed that there were combined the two elements which are sometimes considered by the courts as amounting to insanity constituting a defense—the "comprehension and consequences" rule and the "irresistible impulse" rule. Under the instruction given both of these must have been found by the jury to exist before a finding of insanity could be made.

An instruction almost identical with the one challenged was given and approved by this court in State v. Buck, supra. Here the previous cases were reviewed. Some of them, as State v. Felter, 25 Iowa 67, were distinguished. State v. McGruder, 125 Iowa 741, 101 N.W. 646, was, in effect, overruled. State v. Wegener, 180 Iowa 102, 162 N.W. 1040, contains statements which support defendant's position. But it is pointed out in State v. Buck, supra, that these were dicta. The Buck case contains an analysis of the Iowa authorities, and a further exhaustive treatment of the subject is found in 32 Iowa Law Review No. 4, page 714.

The holding of the Buck case is that the "comprehension and consequences" rule is the true test of insanity in Iowa, and that "irresistible impulse" is not a good defense under an insanity plea. State v. Maharras, 208 Iowa 127, 224 N.W. 537, follows this holding. We have said that the instruction examined in the Buck case was similar in essential respects to the one given here. Each seems to require a finding, not only that there was lack of comprehension of consequences of the act, but that there was an irresistible overpowering of the will. It occurs to us that this form of instruction might be serious error in some cases, as where the defendant made a sufficient showing of lack of comprehension, but showed no irresistible overriding of the

will. Such an instruction might place an undue and unlawful burden upon the defendant.

It was held in the Buck case, however, that "the instruction given was proper, in view of the fact that the appellant, as defendant, at the trial emphasized the suddenness of her mental attack, which entirely enveloped the mind, and, by some compelling influence, caused her to perpetrate the fatal deed." (At page 1039 of 205 Iowa, page 21 of 219 N.W.) The evidence for defendant in the case at bar, given its greatest significance upon the question of insanity, is that he committed the fatal killing while his power to determine right or wrong, that is, his comprehension of the consequences of his act, was suspended by an unconquerable impulse. His own testimony hardly amounts to that much, since he tells of entering the cooler, caressing the victim, falling to the floor with her, some conversation that took place, getting ready to stab her, and doing so. Afterward, he was frightened upon looking at her.

Dr. Max E. Witte, a psychiatrist called as an expert witness by defendant, said that he found him to be in the early stages of catatonic schizophrenia, "a mental disease characterized by periods of stupor and periods of blind rage in which extremely violent, nonsensical, appalling acts are liable to be accomplished and done." Here, if there was a lack of comprehension it was due only to the irresistible impulse operating at the very time of the act.

We are committed to the "right and wrong" test for insanity, and to the exclusion of the "irresistible impulse" theory. "Irresistible impulse" can be a factor under our decisions when, and only when, it so operates upon a diseased mind as to destroy the comprehension of consequences; it is not, in and of itself, a defense. The Iowa law as it now stands excludes it in cases where the power to distinguish between right and wrong is present, but it is claimed that the overpowering passion made it impossible for the defendant to prevent commission of the act.

Under the record in this case we find no prejudicial error in the giving of instruction No. 20.

VI. Assignment of error No. VI is based upon the thought that there was no evidence to sustain instruction No. 12, which submitted the question as to whether defendant assaulted the

deceased with malice aforethought and with intent to have sexual intercourse with her by force and against her will. We hold that there was such evidence, some of it being referred to more specifically in Division IV.

 VII. The information upon which defendant was tried is, so far as material, set out herewith:

"The said Edward James Beckwith, on or about the 22nd day of June A. D. 1949, in the county of Grundy and state of Iowa, did willfully, deliberately and with premeditation and malice aforethought, and while attempting to perpetrate rape upon the person of Irma Jean Stahlhut, murder the said Irma Jean Stahlhut, contrary to the provisions of section 690.2 of the 1946 Code of the state of Iowa."

This was not the original form of the information, the county attorney having been permitted to amend on September 1, 1949. The defendant objected, and now assigns error, because the information as amended would permit a finding of guilty of murder in the second degree; whereas the original information charged murder in the first degree only. The jury having found murder in the first degree, we can see no point at which the defendant has been prejudiced. In any event, the court was within proper bounds in permitting the amendment. State v. Hartung, 239 Iowa 414, 30 N.W.2d 491, discusses the authorities and the statutes bearing upon this question.

 Defendant also predicates error upon the submission to the jury of the issue of whether or not he killed the deceased while attempting to perpetrate rape upon her, because no such charge was made in the information either alternatively or in a separate count. It will be noted that the charge is in the conjunctive; that is, that defendant killed Irma Jean Stahlhut "willfully * * * and malice aforethought, and while attempting to perpetrate rape * * *." (Italics supplied.)

It is the apparent thought of counsel for defendant that the court could submit the "attempt to rape" part of the charge only as an adjunct to, a part of, the willful etc. killing. In instruction No. 6 the jury was told that in order to convict the State must prove the killing by defendant, and "That such stabbing was done with malice aforethought and either willfully,

deliberately and premeditatedly and with specific intent to kill the said Irma Jean Stahlhut, or while the defendant was attempting to perpetrate rape upon the person of said Irma Jean Stahlhut."

It will be noted that, while the information charged conjunctively, the instruction submitted disjunctively. The short answer to defendant's complaint here is found in State v. Heptonstall, 209 Iowa 123, 131, 227 N.W. 616, 619, where we said:

"The aggregate result accruing from the conjunctive statement of the disjunctive elements is but one offense,—libel. On the other hand, the effect of stating a single disjunctive element is a complete offense. Consequently, it is not necessary to prove each disjunctive. If the evidence sustains one, it is enough."

On the same page of the same opinion are found pointed and convincing quotations from State v. Des Moines Union R. Co., 137 Iowa 570, 115 N.W. 232, and State v. Cooster, 10 Iowa 453, which make it clear that defendant's assignment of error upon this point is entirely lacking in merit.

VIII. Defendant bases error upon the failure of the court to submit a form of verdict by which the jury might designate its finding, if such it made, that the killing of Irma Jean Stahlhut was done willfully, deliberately and with premeditation and malice aforethought; and another by which it might designate that its finding, if such it made, was upon a killing done in the attempt to perpetrate a rape. No authority is cited for this novel contention. It is fully answered by the discussion and authorities cited in Division VII. The crime is one, and if a verdict of guilty is to be returned, one form is sufficient.

IX. Other errors claimed by the defendant pertain to rulings upon evidence, a "verdict-urging" instruction, matters that occurred in the jury room, and others not likely to appear upon a retrial.

X. One other matter requires comment. The State contends that the defense waived its right to except to the instructions of the court. Here the State relies upon State v. Hartung, supra. There is no doubt, as shown by the Hartung case and other authorities cited therein, that the right to except to instructions may be waived. It is again a question of fact. In the

248

Hartung case (at page 424 of 239 Iowa, page 497 of 30 N.W. 2d) counsel for the defense was asked by the court: " 'Do you gentlemen desire to take any exceptions to the final draft of the instructions before they are given?' " Defendant's counsel replied: " 'None, Your Honor.' "

In the instant case there was some colloquy about the instructions, which closed with this question by counsel for the State: "I think you made a record on it right there. What instructions are you going to object to?" To which counsel for defendant answered: "Well, I don't know if I'll have any objections to any."

We do not feel that this statement went so far as the flat announcement in the Hartung case that there was no desire on the part of the defense to take exceptions to the instructions before given. Counsel did not commit himself flatly, but prudently left a way of escape, a warning of uncertainty as to his intention, which prevents a holding that he definitely and finally waived exceptions.

For the reasons set forth in Divisions I and II above, a reversal is required.—Reversed.

All JUSTICES concur except MANTZ, J., not sitting.