**STATE of Iowa, Appellee,**

v.

**James Anthony ARTHUR, Appellant.**

**No. 52556.**

Supreme Court of Iowa.

July 18, 1968.

Rehearing Denied Sept. 4, 1968.

James Lawyer, Des Moines, and John D. Cray, Burlington, for appellant.

Richard C. Turner, Atty. Gen., David A. Elderkin, Asst. Atty. Gen., and William L. Hildreth, County Atty., Burlington, for appellee.

SNELL, Justice.

Defendant James Anthony Arthur was indicted for murder (first degree) as defined by sections 690.1 and 690.2, Code of Iowa. He has at all times been represented by experienced and competent counsel. He entered a plea of not guilty. On application of his counsel and order of court he was temporarily transferred to Iowa Methodist Hospital, Psychiatric Department, for psychiatric examination. He thereafter entered an additional plea of not guilty by reason of insanity. He was tried before a judge and jury and found guilty of murder in the second degree. From final judgment entered after ruling on his subsequent motions he appealed. We affirm.

Except for the formal plea of not guilty and defendant's claimed lapse of memory there are no factual issues other than the question of insanity.

The trial court found that James Arthur murdered Helen Barker in June 1966. He had been dating and seeing her frequently since the summer of 1965. He had left his wife in January 1966.

Defendant was born March 25, 1928 and was 38 years of age at the time of trial. He was married in 1947 and his family consisted of his wife and six children.

Helen Barker had been married and had two boys. On weekends her sons would visit their father and defendant would visit Helen Barker, arriving on Saturday and staying until early Sunday evening. During the time that he was dating Helen Barker the defendant suffered two seizures and blackouts, one in August 1965, the other in October 1965. The last seizure occurred while the defendant was driving a government vehicle at a munitions plant and his employment was terminated shortly thereafter. The seizures were recognized as a "grand mal seizure", an epileptic seizure.

On the last weekend of Helen Barker's life, defendant was at her home. On Sunday morning, June 19, 1966, the defendant arose and watched television and then took her car to be washed. While he was washing the car he consumed a part of a pint of whiskey. He drove back to her home and finished cleaning the car. He drank some more bourbon and some beer.

In the afternoon Helen Barker was shot and killed. The muzzle of the weapon was held 12 to 18 inches from her face. It was estimated that she was killed around 1:30 to 2:00 on the afternoon of Sunday, June 19, 1966.

Defendant was seen leaving the house and driving away at about 2:00 p.m. As he left he drove slowly and was looking or staring toward the Barker residence.

Mrs. Barker's body was found by her minor son when he returned home from a trip downtown.

Defendant drove Mrs. Barker's car to Nauvoo, Illinois where he had car trouble. He called a woman named Elaine Rasmussen who went to Nauvoo and took him to her home in Danville. He was arrested at her home between 4:00 and 5:00 the next morning. There was a 22 caliber revolver in the Barker car under the right front seat. The gun was loaded with three live shots and three spent shots. A pawn shop owner said he sold the gun to defendant on June 11, 1966, 8 days before the murder. 22 caliber bullets were found on the defendant when he was arrested.

Defendant in his own behalf testified as to his background, work, health and habits. He said he remembered standing beside Helen Barker with a gun in his hand, but had no recollection of any other details surrounding her death or of his activities during the afternoon and evening of June 19. He had no quarrels with Helen Bar-

ker. He had asked his wife for a divorce, had considered getting a Mexican divorce, was in love with Helen Barker and wanted to marry her.

Other lay witnesses who had known defendant testified as to his physical condition. There is neither claim nor evidence that defendant suffered any grand mal seizure on June 19.

Two doctors who examined defendant were called as witnesses for defendant.

Dr. Summers, a specialist in neurology, testified as to his examination and tests including a pneumoencephalogram.

"These brain wave tests revealed disturbances in the electrical activity of a convulsive disorder which were compatable with a 'grand mal' seizure disorder. * * The only physical activity that takes place during 'grand mal' seizure is that characterized by the convulsive movement. The person is usually unconscious and is not up and moving around. * * *

"It is possible for a person to have the brain atrophy found in this case and except for the times when they are in seizure, to be completely of sound judgment and be able to carry on every day life as a whole. The lobe that was affected by the atrophy is primarily concerned with the feeling and movement of the body parts and normally has nothing to do with the emotions of an individual.

"Mr. Arthur had no loss of memory while I was talking with him and he was orientated at the time. As a part of his medical history he did describe loss of memory."

Dr. Turner, a certified specialist in psychiatry, told of his examination and evidence of a convulsive disorder. There was moderate to substantial atrophy of the brain and evidence of emotional instability. In response to a long hypothetical question he said:

"I have the opinion that this patient could not distinguish right from wrong and as a result of that could not adhere to the right."

On cross examination he said:

"A mental examination was conducted. It is to determine whether or not the patient is orientated, whether he suffers from delusions, hallucinations, whether he appears psychotic. I determined that he was not confused, that he was well orientated and did not appear to be suffering from hallucinations and delusions. He was cooperative, and his affect seemed to be normal. His sensorium, which is an examination to determine the contact of the patient with his environment, was intact and complete. His crying was appropriate to the conversation at the time, but his responses to the conversation, recovery from the conversation seemed to me to be unstable. It is true that character changes in and of themselves do not amount to insanity. They are indicative of a change in personality, the attitudes of the patient, the style of life. The tracings from the EEG were not specific to the type of convulsive disorder. I wouldn't express an opinion about the type of epilepsy. All that concerns me at this point medically speaking that the patient suffers from a convulsive disorder and that appears to be associated with an underlying illness.

"A person cannot perform physical activity which requires volition in the state of a grand mal seizure. The defendant had brain atrophy which was moderate to severe in nature, and this is consistent with the clinical findings. Just because a person is emotionally unstable, does not necessarily mean that he does not know the difference between right and wrong, or the nature and consequences of his acts. * *

"No other tests were performed other than the mental status test, the sensorium, the medical history and the EEG. A standard psychological test to determine mental capacity was not used. It is possible that on June 19, 1966 the defendant knew the difference between right and wrong when he shot Helen Barker."

Nowhere do we find in the testimony of any witness any suggestion that defendant was suffering from an irresistible impulse when he shot Mrs. Barker.

Dr. Eggert, a specialist in psychiatry with the Mental Health Institute at Mount Pleasant, testified in rebuttal for the state. He had heard part of the testimony and examined the x-rays. In response to a long hypothetical question he diagnosed defendant as a sociopathic personality with a convulsive disorder, grand mal epilepsy. As to the effect on defendant he said:

"I think it had no effect on his ability to reason and think. My opinion is that he did understand the nature and quality of the act and he understood the consequences of the act and the harmfulness of it. I have no opinion as to whether he was able to adhere to the right or to the wrong. My opinion is that he knew the difference between right and wrong. * * *

"A person with organic brain disease, such as Mr. Arthur, using dilantin coupled with alcohol could be in a state of non-memory."

I. The only issue in the trial court as to defendant's insanity was that tendered by defendant, i. e. that he had epilepsy and some atrophy of the brain and as a result was unable to distinguish right from wrong. Based on this defense and the evidence offered the court instructed accordingly, using the well known M'Naghten knowledge of right from wrong test. There were no requests for instructions on any other theory. Prior to the jury's verdict there were no exceptions to the instructions.

In a criminal case exceptions to instructions based on error therein need not be taken before submission to the jury. However, if additional or more explicit instructions are desired they should be requested before they are given to the jury. In the case before us the instructions covered the only issue tendered and the only evidence offered. The trial court did not commit reversible error in failing to instruct on an issue not tendered and concerning which there was no evidence. See State v. Horrell, 260 Iowa ——, 151 N.W.2d 526, 532 and cases cited therein.

Even though there was no error as now alleged we would not let a finding of guilt stand if on the whole record we determine that a fair trial was not had.

II. A plea of insanity does not relieve the state from proving every fact essential to establish the crime and defendant's guilt. The law presumes all men sane until the contrary is established by competent evidence to the satisfaction of the jury. State v. Bruce, 48 Iowa 530, 533, 534, State v. Robbins, 109 Iowa 650, 80 N. W. 1061. There is no issue before us as to these propositions and further consideration thereof is unnecessary.

III. Although in the case at bar we find nothing to support any theory of the defense other than the one submitted the defendant in a motion for new trial and on appeal made a broad attack on the rule and asks for a second chance. Some consideration thereof seems appropriate. In his brief and argument defendant tenders the issue before us in these words:

"The only question on this appeal is whether the trial court erred in not granting the Motion for a New Trial and in not sustaining the defendant's exceptions to the instructions. This, in turn, raises the question as to whether or not the so-called M'Naghten Rule as a test for criminal responsibility in Iowa should be replaced by the American Law Institute Rule set forth in the Model Penal Code or the Durham Rule. Also the question arises whether the irresistible impulse rule should have been applied in this case as an exception to the general rule prevailing in Iowa."

Volumes have been written and acrimonious words employed in discussion of these rules. We will mention only a few.

Most discussions of the insanity defense begin with Daniel M'Naghten's Case,

House of Lords, 1843, 10 Cl. & F. 200, 8 Eng.Reprint 718, the leading case propounding the "right-wrong" test of insanity.

There were some older rules of insanity in England. The "wild beast" test would allow a "lunatic" to escape punishment if he was "so totally deprived of understanding and memory as to be as ignorant of what he was doing as a wild beast." Blackstone, writing in 1776, stated that "idiots and lunatics are not chargeable for their own acts, if committed when under these incapacities; no, not even for treason itself."

The "right-wrong" test is older than M'Naghten. Justice Fairchild of the Wisconsin Supreme Court points to the use of the "right-wrong" test in Earl Ferrers' Case (1760), 19 Howell's State Trials 886, in which it is stated:

"My lords, the question therefore must be asked: is the noble prisoner at the bar to be acquitted from the guilt of murder, on account of insanity? * * * Could he, did he, at the time distinguish between good and evil?" Quoted from State v. Esser, 16 Wis.2d 567, 115 N.W.2d 505, loc. cit. 510 (1962).

Daniel M'Naghten, having the delusion of persecution and believing that he was being hounded by his enemies, shot and killed Edward Drummond, private secretary to Sir Edward Peel, perhaps even mistaking Drummond for Peel. The verdict was not guilty on the ground of insanity. The House of Lords said that "in all cases that every man is to be presumed to be sane, and to possess a sufficient degree of reason to be responsible for his crimes, until the contrary be proved * * *." The jury, according to Lord Chief Justice Tindal, is to be asked "whether the accused at the time of doing the act knew the difference between *right* and *wrong*" when a defense of insanity is raised. (Emphasis added)

The matter of insanity is most fluid largely because it is a question partly belonging to legal and partly to medical science.

Iowa, from the beginning and in accordance with the views of a great majority of the states, has applied the "M'Naghten" test of knowledge of right and wrong in cases of this sort.

State v. Maharras, 208 Iowa 127, 130, 224 N.W. 537 (1929), states the insanity defense as it is applied in Iowa Courts:

"The rule simply means that the jury should be told, in substance that, if the defendant's act in taking the life of a person was caused by mental disease or unsoundness which would dethrone his reason and judgment with respect to that act, thereby destroying his power rationally to comprehend the nature and the consequences of that act,—that is, the ability to know and distinguish *right* from *wrong*,—then he is not amenable to punishment. On the other hand, if the jury believe, from the evidence and circumstances, that the defendant was in possession of a rational intellect and sound mind, but allowed his passions to escape control, then he cannot claim for such act protection on a plea of insanity." (emphasis added)

IV. The earliest Iowa case in which the Iowa Supreme Court gave an opinion concerning the insanity defense in a criminal case was State v. Felter, 25 Iowa 67 (1868), an appeal from a murder conviction. On appeal Chief Justice Dillon rules that the irresistible impulse rule should supplement the M'Naghten Rule in Iowa. On page 82 this appears: "If * * * the defendant committed the act from an irresistible and uncontrollable insane impulse, not knowing it was wrong, it is clear that he is not criminally responsible." Thus Iowa became one of the first states to recognize the "irresistible impulse" test as a supplement to the M'Naghten Rule.

State v. Buck, 205 Iowa 1028, 219 N.W. 17 (1928) became a leading case in Iowa on the point of the insanity defense, because it restricted the irresistible impulse to those cases in which the rule could be

brought within the right and wrong legal test. The Buck opinion approves the following instruction, which is based on the law quoted in the earlier case of State v. Felter, supra:

"In order to be an excuse and defense for a criminal act, the person accused, and who claims insanity as a defense, must prove that the crime charged was caused by mental disease or unsoundness which dethroned, overcame, or swayed her reason and judgment with respect to that act, which destroyed her power rationally to comprehend the nature and consequences of that act," * * * and "which, overpowering her will, irresistibly forced her to its commission."

This instruction does not contain anything about "knowledge of right and wrong," which is the phrase normally used in explanation of the M'Naghten rule. Instead the phrase used is "comprehend the consequences of that act." The phrase "comprehend the consequences" is somewhat unique in Iowa, but it is still used in the most recent cases.

The rule in State v. Maharras, supra, gives a clearer explanation of the Iowa application of the M'Naghten rule because the phrase "knowledge of right and wrong" is there equated with Judge Dillon's phrase "comprehend the consequences."

More recent Iowa cases deal with the present status of the insanity defense.

State v. Beckwith, 242 Iowa 228, 46 N. W.2d 20 (1951), limits the irresistible impulse rule, as Buck had done. This appears on page 245 of 242 Iowa, on page 30 of 46 N.W.2d:

"We are committed to the 'right and wrong' test for insanity, and to the exclusion of the 'irresistible impulse' theory. 'Irresistible impulse' can be a factor under our decisions when, and only when, it so operates upon a diseased mind as to destroy the comprehension of consequences; it is not, in and of itself, a defense. The

Iowa law, as it now stands, excludes it in cases where the power to distinguish between right and wrong is present, but it is claimed that the overpowering passion made it impossible for the defendant to prevent commission of the act."

In State v. Hodge, 252 Iowa 449, 464, 105 N.W.2d 613, we followed Beckwith and said that irresistible impulse should be used with caution and only in exceptional cases.

State v. Gramenz, 256 Iowa 134, 126 N. W.2d 285 (1964), approves the language of Beckwith. "We are committed to the M'Naghten rules or the 'right and wrong' test and have rejected the 'irresistible impulse' modification except when it so operates upon a diseased mind as to destroy the comprehension of consequences. * * *" (loc. cit. 138, 126 N.W.2d at p. 288)

■ Thus it appears that the theory of irresistible impulse may when, but only when, appropriate under our rules be submitted but there is nothing in the case at bar to require or even justify its submission.

It is obvious that for us to accept a new test of insanity would require the reversal of long standing case law in Iowa. But the appellant thinks such a reversal is desirable and in keeping with a trend in other jurisdictions. If there is a trend for change it is moving at a pace much too slow to aid defendant here.

■ We are not prepared to hold that occasional grand mal seizures, some brain atrophy that does not destroy the ability to know right from wrong, wife desertion or keeping company with "other women" indicates that degree of instability as to relieve from responsibility for murder.

V. Presently there is dissatisfaction on the part of some legal scholars and psychiatrists with the M'Naghten Rule. Dr. William Alanson White, Superintendent of St. Elizabeths Hospital in Washington, D. C., for 34 years was an arch critic of the

M'Naghten Rule and the "irresistible impulse" test. See article by Mr. Justice William O. Douglas in 41 Iowa Law Review 485, 495 (1956). Dr. White became so disillusioned with the law of insanity that for many of his later years he refused wherever possible to go into any court for any purpose. Mr. Justice Cardozo once said of the M'Naghten Rule that we mock ourselves with a definition that palters with reality.

Circuit Judge Kaufman in United States v. Freeman, 357 F.2d 606, 616 (2nd Cir. 1965), implies that the now discredited studies of phrenology (study of bumps on the cranium) and monomania (one insane idea predominates while the rest of the thinking process remains normal), had some influence on the development of the M'Naghten Rule.

Some writers assert that the "right-wrong" test does not permit consideration of advances in psychiatry since 1843. We do not agree. There is nothing to prevent a psychiatrist from testifying at length and in detail as to his tests and findings according to the most advanced teachings of his profession. Medicine and not the law is best equipped to determine what a man can or cannot do but it is for the law to say what constitutes legal responsibility.

Some say that the "right-wrong" test is too narrow in its scope and does not allow the defense to present all the facts and evidence that the jury should have in making the ultimate decision of guilt or innocence.

Judge Barnes of the 9th Circuit does not think that evidence which the jury should have is withheld under the M'Naghten Rule. See Sauer v. United States, 241 F. 2d 640 (9th Cir. 1957). Judge Barnes said:

"There appear to be some who believe that the expert witness is asked but one question: 'Did the accused know right from wrong?' Nothing could be farther from the truth. The inquiry quoted is but the ultimate question. For example, in the instant matter [the Sauer Case], * * * the court appointed psychiatrist, testified at length regarding the appellant's disorders before he was asked the critical question. The appellant's entire mental condition was brought to the attention of the jury. Dr. Miller cogently and concisely described appellant's abnormality in language that could be clearly understood by the jury. * * * *"

The same is true in the case at bar. Two psychiatrists testified at length about Arthur's abnormalities in language clearly understood by laymen in the jury and did not seem to be "strait jacketed" by the "right-wrong" test.

Dwight McCarty, in his book "Law and Psychology", lists three objections to the traditional tests:

1. The main objection to the M'Naghten Rule is that it provides only a hard and fast rule that touches only a small fraction of the mentally ill, leaving a large fraction uncovered. It reaches some but not all psychotics.

2. Another objection is that mental disorders are independent of "knowledge" and there is no method, scientific or otherwise, that can determine whether an accused person knows the nature and quality of his acts or the right and wrong quality of those acts. The test is objective and cannot disclose the subjective mental condition.

3. A third objection is that these old tests are based on the common law version of the medical knowledge of a century ago and that they are entirely inadequate under present day psychiatry.

Mr. Justice Cardozo said that the M'Naghten Rule is "neither good morals nor good science nor good law."

Mr. Justice Frankfurter called the M'Naghen Rule a sham in his testimony before the Royal Commission on capital punishment.

VI. Scholars who are dissatisfied with the present test have formulated alternatives, the Durham test and the American

Law Institute test of the Model Penal Code.

The United States Court of Appeals for the D. C. Circuit in the case of Durham v. United States, 94 U.S.App.D.C. 228, 214 F. 2d 862 (1954) first formulated the Durham Rule. The Durham Rule "is simply that an accused is not criminally responsible if his unlawful act was the product of mental disease or mental defect." Judge Bazelon suggests that this instruction be given:

"If you the jury believe beyond a reasonable doubt that the accused was not suffering from a diseased or defective mental condition at the time he committed the criminal act charged, you may find him guilty. If you believe he was suffering from a diseased or defective mental condition when he committed the act, but believe beyond a reasonable doubt that the act was not the product of such mental abnormality, you may find him guilty. Unless you believe beyond a reasonable doubt either that he was not suffering from a diseased or defective mental condition, or that the act was not the product of such abnormality, you must find the accused not guilty by reason of insanity. Thus your task would not be completed upon finding, if you did find, that the accused suffered from a mental disease or defect. He would still be responsible for his unlawful act if there was no causal connection between such mental abnormality and the act * * *."

It should be noted that the first sentence of the instruction alters the presumption of sanity which is traditional in the law of Iowa. See Division II, supra. The Durham instruction would put the additional burden of proving sanity on the State in every criminal trial.

The Durham Rule purports to follow a then existing New Hampshire rule. Maine adopted the Durham Rule by statute in 1963. Maine Rev. Stats., 1963 Supp., vol. 4, c. 149, sec. 17–B. There are only a few jurisdictions that have departed from the "right-wrong" test in favor of the Durham Rule or a test like the Durham Rule.

It is proper for psychiatrists to advocate what they believe. Because of pressure from them (and from legal scholars who think that M'Naghten is unworkable) some jurisdictions have adopted Durham. Although many psychiatrists think that the Durham Rule is good, the Durham Rule may raise as many legal problems as it resolves.

If the Durham Rule should replace M'Naghten in Iowa, the semantic problems would still be with us. Sauer v. United States, supra. The jury will not understand the special language of the psychiatrist; the psychiatrist will not be able to communicate in the language of the layman; the lawyers and judges are not trained in psychiatry, and psychiatrists do not agree with the processes of law.

The public is critical (sometimes properly so) of the courts when people who do not deny their criminal acts are acquitted by the plea of insanity. Durham will make the test of insanity even more uncertain, and the defense will be more attractive to an accused. Sauer v. United States, supra.

In the case before us if we thought that the defendant had been unfairly treated we would reverse without hesitation but such is not the case.

Man, as the law presently expresses itself, is regarded as a moral being. The law places upon citizens a "criminal responsibility" so that after committing criminal acts, the criminal is to be punished. It is not the province of the psychiatrist to deal with moral guilt. For the psychiatrist to dictate to the courts through the Durham Rule would violate this principle of law; that man is regarded as a moral being. We are not ready to see an erosion of that principle. Perhaps in the near future, psychiatrists may convince us that society should not be concerned with "moral guilt," but that time is not here. Until that time the court must be responsive to the medical profession, the law and the public. Lawyers must work within their experiences. Often it has been stated that

the lawyer, and the judge should not leave common sense outside the courtroom door, and make decisions only on speculative theory.

The Durham Rule would acquit all whose criminal acts are a product of mental disease or a mental defect. Some scholars, with good reason, say all crime is a consequence of mental aberration. We certainly agree that crime is not the product of good judgment. Psychiatrists say that all persons vary from the norm in some way or another; the law presumes all defendants to be sane. Social chaos might supplant law and order if mental aberrations were accepted as an excuse from legal responsibility. Mr. Justice Clark stated: "The science of psychiatry has made tremendous strides * * * but the progress of science has not reached a point where its learning would compel us to require the states to eliminate the right and wrong test from their criminal law." Leland v. State of Oregon, 343 U.S. 790, 72 S.Ct. 1002, 96 L.Ed. 1302 (1952).

VII. Another formula for insanity which has recently been adopted by a few jurisdictions is the American Law Institute's test as found in the Model Penal Code:

"Mental Disease or Defect Excluding Responsibility.

"(1) A person is not responsible for criminal conduct if at the time of such conduct as a result of a mental disease or defect he lacks substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law.

"(2) The terms 'mental disease or defect' do not include an abnormality manifested only by repeated criminal or otherwise anti-social conduct."

The Illinois legislature adopted this A.L.I. test with only one minor change in language. It now appears as section 6–2 of the Illinois Criminal Code of 1961, 38 Smith-Hurd Ill.Ann.Code 6–2.

Recently the Wisconsin Supreme Court adopted the American Law Institute Rule, not as a substitution for M'Naghten, but as a supplement. The defendant in Wisconsin may now waive the "Esser test" (M'Naghten Rule as found in Wisconsin) and be permitted to have an instruction following the American Law Institute Rule. State v. Shoffner, 31 Wis.2d 412, 143 N.W.2d 458 (1966).

The case of State v. White, 60 Wash.2d 551, 374 P.2d 942 (1962) is a case which rejects the application of both the Durham Rule and the American Law Institute Rule in Washington.

United States v. Currens, 290 F.2d 751 (3rd Cir. 1961) rejects the M'Naghten test because the judge (Biggs, Chief Judge) thought it was unworkable and old-fashioned in light of the present science of psychiatry. But he found also that the Durham formula was "too vague and indefinite to provide a workable rule for determination of criminal responsibility." That case adopts the American Law Institute Rule in the courts of the Third Circuit and suggests an acceptable instruction.

Objections to the American Law Institute Rule might be similar to the objections to the Durham Rule. The instruction suggested by the Third Circuit seems to place the burden of proving sanity on the state and is vague when compared with M'Naghten.

Justice Fairchild of the Wisconsin Supreme Court in State v. Esser, supra, stated that the M'Naghten Rule is no perfect solution, but also that alternatives to the M'Naghten Rule (Durham and the American Law Institute test) can also be legitimately subjected to criticism.

We are not convinced that the M'Naghten Rule, supplemented as it may be in appropriate cases, is unworkable in Iowa, nor are we convinced that alternatives to M'Naghten are better solutions.

VIII. An interesting article on "Psychiatry in the Legal Process: 'A Knife

that Cuts Both Ways'" by Alan M. Dershowitz, a member of the District of Columbia bar, a professor of law at Harvard University and a consultant to the National Institute of Mental Health, appears in the May 1968, issue of the Journal of The American Judicature Society. We quote excerpts:

"Much has been written about one cutting edge: the contributions made by psychiatry. I will focus on the other side of the blade: the social costs incurred by the increasing involvement of the psychiatrist in the administration of justice. An important—if subtle—consequence of psychiatric involvement has been the gradual introduction of a medical model in place of the laws' efforts to articulate legally relevant criteria. The cost of this substitution has been confusion of purpose, and in some instances, needless deprivation of liberty. * * *

"Dr. Isaac Ray, an early psychiatric critic, called the M'Naghten rule a 'fallacious' test of criminal responsibility, arguing that: 'Insanity is a disease, and, as in the case with all other diseases, the fact of its existence is never established by a single diagnostic symptom'—such as inability to distinguish right from wrong. * * *

"This attempt to impose a medical model on the legal process of distinguishing the responsible from the irresponsible continued through the 19th century and into the 20th. It culminated in the case of Durham v. United States, decided in 1954. The argument for the Durham rule was simple— if one accepted Ray's erroneous premise. For if M'Naghten was simply an attempt to identify those persons considered mentally ill by psychiatrists, then why bother to go through the indirection of listing symptoms? Why not make the test the existence of mental illness itself? Abe Fortas, counsel for Durham and now Justice Fortas, argued that substitution of a new rule for M'Naghten would permit psychiatrists to testify in 'the terms of their own discipline, and not in the terminology of an irrelevant formula.' Why the 'right-wrong' formula was irrelevant for legal purposes the court was never told, except that it did not permit psychiatrists to testify in terms of their own discipline. The possibility that the terms of their own discipline are not particularly relevant to a perfectly rational legal rule was never considered. * * *

"Although the author of Durham, Judge Bazelon, has always regarded that case as merely an opening wedge in a continuing search for just and workable criteria of responsibility, many psychiatrists interpreted Durham as an invitation for them to decide who should and who should not be held criminally responsible. * * *

"There have been judicial adumbrations of disillusionment with the medical model. But it is a discouraging history of usurpation and abdication: of an expert being summoned for a limited purpose, assuming his own indispensability, and then persuading the law to ask the critical questions in terms which make him more comfortable and his testimony more relevant. The upshot has been to make the psychiatrist's testimony more relevant to the questions posed, but to make the questions themselves less relevant to the purpose of the law."

IX. Our study reveals two things:

(1) There is lack of unanimity among scholars as to what is the best rule.

(2) The defendant herein had a fair trial and there is nothing in the record before us to cause retreat from well established majority rule.

The case is

Affirmed.

All Justices concur, except BECKER and LeGRAND, JJ., who dissent.