**IN THE COURT OF APPEALS OF IOWA**

No. 19-1649
Filed February 16, 2022

**STATE OF IOWA,**
    Plaintiff-Appellee,

**vs.**

**TOBY LEE McCUNN,**
    Defendant-Appellant.
_____

Appeal from the Iowa District Court for Page County, Margaret Reyes
(venue) and Jeffrey L. Larson (trial), Judges.

A defendant appeals his conviction for first-degree murder.  **AFFIRMED.**

Martha J. Lucey, State Appellate Defender, and Mary K. Conroy, Assistant
Appellate Defender, for appellant.

Thomas J. Miller, Attorney General, and Aaron Rogers and Louis S. Sloven,
Assistant Attorneys General, for appellee.

Heard by Tabor, P.J., and Greer and Ahlers, JJ.

**TABOR, Presiding Judge.**

No question, Toby McCunn killed Josh Jordan. The prosecution painted this picture: McCunn—fixated on retrieving stolen property from Jordan—tracked him over several days, lured him into a friend's home in Shenandoah, and shot him. But McCunn argued that in the final moment it was Jordan who drew his gun first. And McCunn acted in self-defense. The jury rejected that defense, finding McCunn guilty of first-degree murder. McCunn now contends that (1) the court did not properly instruct the jury on justification; (2) the court should have moved the trial from Page County; (3) the jury was biased because the court failed to strike a juror for cause; and (4) the court should have excluded prior bad acts evidence.[1]

We find the court did not commit instructional error; pretrial publicity did not compel a change of venue; seating the challenged juror did not entitle McCunn to a new trial; and the court did not abuse its discretion in allowing testimony that McCunn threatened a witness at gunpoint to help him find Jordan. So we affirm.

## I. Facts and Prior Proceedings

At trial, the State advanced its theory that McCunn was hunting for Jordan and Jordan knew it. By his own admission, McCunn was "obsessed" with finding the person responsible for taking his belongings. In an interview with law enforcement at the hospital, McCunn claimed that he loaned someone his truck and that person burglarized his house—stealing personal property, including tools,

---

[1] As a back-up, McCunn argues if any of these claims are not preserved, ineffective assistance of counsel is to blame. And he contends, because Iowa Code section 814.7 (Supp. 2019) does not allow us to hear such claims on direct appeal, that section is unconstitutional. Because we reach the merits of his four issues, we need not address his constitutional challenges to the statute.

a guitar, his children's piggy banks, and remote control cars. McCunn said he was "emotional" because he had "his castle fuckin' broken into."

McCunn's obsession was corroborated by Cesar Cepeda, the only eyewitness to the April 21, 2019 shooting called to testify at trial. Cepeda recalled that about one month before the shooting Jordan expressed fear that McCunn was looking for him, believing that Jordan had some of his "lost belongings." Jordan's concern prompted him to start carrying a .22 revolver.

**Also one month before the shooting.** Jordan and his friend Seth Rogers were at the home of a mutual friend. Rogers testified that they heard noises outside and then a knock at the door. Jordan answered. The visitor, McCunn, flashed a strobe light. Jordan slammed the door and locked it. But McCunn came in through the back door. McCunn and Jordan "scuffled" and each pulled a handgun. In the scuffle, McCunn dropped his gun, and Jordan picked it up. From three feet away, Jordan pointed his gun at McCunn and said, "Get out." He then fired a warning shot past McCunn's head. McCunn ran "real fast" out the front door. Afterward, Jordan told the others to "lock the doors" and left.

**Two weeks before the shooting.** McCunn showed up at the home of his friend and tattoo artist Jeff Lusk. McCunn wanted a tattoo. But rather than pay for it, McCunn offered to barter. He showed Lusk two pistols, which Lusk declined. McCunn said he was using the guns "to take care of some business," specifically that he "wanted to kill this person," but did not give a name. Lusk testified that McCunn was "going to have somebody call to lure [this person] to the house." The luring would be done by "some girl," maybe the person's ex-girlfriend.

**Ten days before the shooting.** Rogers encountered McCunn at Mike Morelock's house on Elm Street in Shenandoah. Although it was late at night, an angry McCunn demanded that Rogers help find Jordan. Rogers complied, riding with McCunn and checking houses where Jordan might be. McCunn also stopped at Wal-Mart, where he bought a gun holster. While McCunn steered with his left hand, he used his right hand to point a pistol at Rogers. They capped off the night at the Nishnabotna River, where McCunn and Morelock fired off a few rounds.

**The evening before the shooting.** Jordan was at the home of his brother, Jacob. Also there were Jacob's wife and one-year-old son. They heard noises outside and found McCunn approaching the door. Jacob told him to leave, but McCunn refused until Jacob showed him a gun and Jacob's wife began calling 911. As he left, McCunn said, "Don't give them my license plate number or I'll be back." Jacob believed his brother was scared of McCunn. Josh Jordan showed his gun, explaining, "someone basically set him up or there was some stolen property that was blamed on him" and someone sent McCunn "to hunt him down."

**The night of the shooting.** Cory Archer and a group of friends were at Morelock's house on Elm Street. McCunn was there too and asked them to "lure" Jordan to a location where McCunn could "meet up" with him. One friend was on the phone for a long time. Then several people left in McCunn's car.

**Also that night.** Jordan and Cepeda went to the home of Kevin Weil and Brandy Baker on Manti Street where all four used methamphetamine and marijuana. Jordan and Baker had once been in a romantic relationship and had children together. After about an hour, Jordan and Cepeda walked toward Cepeda's house. While walking Jordan was on his phone. He told Cepeda that

Weil and Baker would give them a ride to another friend's house. So they returned to Manti Street. On the way, Jordan said something like "he wouldn't think [Baker] would set him up."

Jordan and Cepeda entered the Manti Street house and walked down a long hall toward the kitchen, Jordan leading the way. At the end of the hallway, Cepeda saw McCunn standing in the kitchen pointing a 9 mm handgun at Jordan. McCunn told them to get on the ground. Cepeda said they didn't follow the instruction because they were not afraid. Jordan stood at the end of the kitchen island. He walked forward a bit but stopped when McCunn said, "Don't 'F' with this." Jordan had his hands up and told McCunn "there could be another way to handle this." Cepeda heard McCunn say, "Don't reach for it." Cepeda recalled that Jordan had his hands at "waist level" and "the lower his hands were getting the more [McCunn] was telling him not to reach for it."

In Cepeda's words, "It was gunshots after that." He heard two or three shots and ran to the exit. Jordan "fell on his butt" and threw his pistol in Cepeda's direction down the hall. Weil shouted, "someone call 911," to which McCunn said, "If you call 911, I'm going to have to kill you all." Cepeda testified Jordan's hands never touched his waistband before the shooting.

**Later that night.** Despite McCunn's warning, Baker called 911. First responders tried CPR and other interventions, but could not revive Jordan. He had lost too much blood from his two gunshot wounds—one through his heart and left lung, another through his right mid-back and shoulder blade. Jordan died from those wounds.

Meanwhile, the friends at Morelock's house soon learned that McCunn had also been shot. Archer went to pick him up. As he got into the car, McCunn said, "[Jordan] shot me." Archer could see McCunn had a gunshot wound in his leg. Back at the Elm Street house, McCunn urged his friends not to call police. But he asked them to put his car in Morelock's garage. Archer also saw that McCunn had a black handgun with him.

**The next day.** Law enforcement surrounded Morelock's house. The occupants, including McCunn, came out within thirty minutes. Police transported him to the hospital for treatment of his leg wound. Officers recovered guns at the Elm Street house that were later connected to the Manti Street shooting.

**The aftermath.** After law enforcement investigated the shooting, the State charged McCunn with first-degree murder. Alleging a "tremendous amount of publicity" surrounding the case, McCunn moved for a change of venue from Page County. The court denied the motion. McCunn raised a justification defense at trial. But the jury returned a verdict of first-degree murder. McCunn appeals.

## II.    Analysis

### A. Justification Instruction

The court issued this instruction on self-defense and provocation:

Instruction No. 30
The Defendant claims he acted with "justification." A person is "justified" in the use of reasonable force when the person reasonably believes that such force is necessary to defend oneself from any actual or imminent use of unlawful force.
A person who reasonably believes that a forcible felony is being or will be imminently perpetrated is justified in using reasonable force, including deadly force, against the perpetrator to prevent or terminate the perpetration of that felony.
The State must prove at least one of the following elements to show that Defendant was not justified:

      1. The Defendant provoked the use of force against himself with the intent to use such force as an excuse to inflict injury on the other person.

      2. The Defendant did not believe he was in imminent danger of death or injury and the use of force was not necessary to save him.

      3. The Defendant did not have reasonable grounds for the belief.

      4. The force used by the Defendant was unreasonable.

The State has the burden to prove the Defendant was not acting with justification.

McCunn had proposed this instruction:

      Concerning element number _____ of Instruction No. _____, though a person who provokes the use of force against himself is not justified, there is an exception.

      If Toby McCunn provoked the use of force, but Joshua Jordan used force greatly disproportionate to the provocation and it was so great that Toby McCunn reasonably believed he was in imminent danger of injury, he is not considered to have provoked the incident and his acts would be justified.

On appeal, McCunn claims the court failed to instruct the jury that he could prove justification even if he provoked the use of force, if Jordan's force was grossly disproportionate to that provocation.

## 1.     Error Preservation

The State contends McCunn did not preserve error by submitting the proposed instruction. According to the State, the defense needed to object specifically to the missing provocation-proportionality instruction.

We agree that merely submitting a proposed instruction does not preserve a challenge for review. *See Bauer v. Cole*, 467 N.W.2d 221, 224 (Iowa 1991); s*ee*

*also* Iowa R. Civ. P. 1.924[2]; Iowa R. Crim. P. 2.19(5)(f).[3] "When a court refuses to give requested instructions, the objecting party must preserve error by timely specifying that part of the instruction which was requested and refused." *Id.*

But contrary to the State's argument, McCunn did more than propose the provocation-proportionality instruction. While the parties debated jury instructions, the defense addressed justification:

> The defendant will be objecting to Instruction Number 30. The defendant proposes this Court use the instruction the defendant— used in defendant's proposed jury instructions regarding justification.
> And the defendant will be objecting to Instruction Number 33 where—the second paragraph the defendant would propose the use of defendant's proposed jury instruction regarding the perfect—the defendant is not required to exercise perfect judgment, and that is all of defendant's objections to the proposed jury instructions.

The court responded: "I understand and reviewed the justification instructions that the defense submitted. Unfortunately we don't have uniform instructions on that topic, and I believe that the Instructions 30 and 33 best explain the law on this issue, and I will overrule those motions." We find this exchange preserved error on the alleged defect in the justification instructions.

### 2.    Merits

We review a refusal to give a jury instruction for correction of errors at law. *State v. Montgomery*, 966 N.W.2d 641, 649 (Iowa 2021). We view the instructions as a whole. *See State v. Davis*, 951 N.W.2d 8, 17 (Iowa 2020). The court must

---

[2] "[A]ll objections to giving or failing to give any instruction must be made in writing or dictated into the record . . . specifying the matter objected to and on what grounds. No other grounds or objections shall be asserted thereafter, or considered on appeal."

[3] "The rules relating to the instruction of juries in civil cases shall apply to the trial of criminal cases."

instruct the jury "as to the law applicable to all material issues in the case." *State v. Becker*, 818 N.W.2d 135, 141 (Iowa 2012) *overruled on other grounds by Alcala v. Marriott Int'l, Inc.*, 880 N.W.2d 699, 708 n.3 (Iowa 2016). To that end, the court must give an instruction "if it correctly states the applicable law and is not embodied in other instructions." *State v. Benson*, 919 N.W.2d 237, 246–47 (Iowa 2018) (citation omitted).

McCunn argues that without the gross-disproportionality instruction, the jury could not embrace his defense theory—that he did not intend to use deadly force until Jordan reached for his gun. He contends the proposed instruction explained the applicable law and was not embodied in any other instruction. With the instruction, he contends the jury could have considered whether Jordan reached for his gun or shot at McCunn first and whether that response by Jordan was an overreaction to McCunn's provocative acts of hunting Jordan and luring him to the Manti Street house.

Under state law, a person is justified in using reasonable force when the person reasonably believes that force is necessary to defend oneself from any actual or imminent use of unlawful force. Iowa Code § 704.3. But a justification defense is unavailable to the following:

> 1. One who is participating in a forcible felony, or riot, or a duel.
> 2. One who initially provokes the use of force against oneself, with the intent to use such force as an excuse to inflict injury on the assailant.
> 3. One who initially provokes the use of force against oneself by one's unlawful acts, unless:
> a. Such force is grossly disproportionate to the provocation, and is so great that the person reasonably believes that the person is in imminent danger of death or serious injury or

   b. The person withdraws from physical contact with the other and indicates to the other that the person desires to terminate the conflict but the other continues or resumes the use of force.

*Id.* § 704.6.

The caveat for a grossly disproportionate use of force only appears in alternative three of section 704.6, when the defendant's provocation comes in the form of "unlawful acts." But the jury was not given an instruction corresponding to alternative three. Instruction No. 30 on justification informed the jury that the State could prove McCunn was not justified if it proved one of four things: (1) McCunn provoked the use of force against himself intending to use such force as an excuse to inflict injury on Jordan; (2) McCunn did not believe he was in imminent danger of death or injury and the use of force was not necessary to save him; (3) McCunn lacked reasonable grounds for the belief; or (4) the force used by McCunn was unreasonable.

None of these options aligns with alternative three of section 704.6. The jurors would only have reason to consider whether Jordan's use of force was "grossly disproportionate to [McCunn's] provocation" if they had been instructed that McCunn engaged in "unlawful acts" to provoke Jordan's use of force. McCunn's proposed instruction did not assert that McCunn had provoked Jordan's use for force by committing "unlawful acts." When asked at oral argument, McCunn's appellate counsel suggested that McCunn may have been engaged in harassment or assault when Jordan shot him in the leg. But McCunn did not rely on subsection 3 at trial. With no assertion that McCunn's provocation encompassed "unlawful acts," the gross-disproportionality instruction did not apply

to a material issue in the case. *See Becker*, 818 N.W.2d at 141. So the court did not err in declining to give it.

## B. Change of venue

Next, McCunn challenges the failure to move his trial from Page County. We review this issue de novo. *State v. Newell*, 710 N.W.2d 6, 33 (Iowa 2006). The district court can order a change of venue if the defendant shows there is such a degree of prejudice "that there is a substantial likelihood a fair and impartial trial cannot be preserved with the jury selected from that county." Iowa R. Crim. P. 2.11(9)(b). "Reversal is warranted only where the trial court's decision demonstrates an abuse of discretion." *Newell*, 710 N.W.2d at 33 (citation omitted).

To reverse his conviction, McCunn must show either (1) actual prejudice on the part of the jury[4] or (2) that prejudice must be presumed because the publicity attending the case was so pervasive and inflammatory. *See State v. Wilson*, 406 N.W.2d 442, 445 (Iowa 1987). "Media accounts that are factual and informative in tone do not support a claim that they must be presumed to have created prejudice against a defendant." *Id.* Whether media coverage was pervasive and

---

[4] The State contends McCunn did not preserve a claim of actual prejudice. But we do not read McCunn's argument as a claim of actual prejudice. Rather, he cites passages from voir dire to emphasize that the pretrial publicity was so pervasive and inflammatory that prejudice must be presumed. *See State v. Siemer*, 454 N.W.2d 857, 861 (Iowa 1990). Granted, Siemer renewed his motion for change of venue after voir dire. *Id.* And McCunn did not. But we do not find authority that failure to renew the motion prohibits our consideration of voir dire. Indeed, in *State v. Williams*, the supreme court found that the district court properly denied a motion for change of venue based on articles published several months before the trial. 62 N.W.2d 742, 744 (Iowa 1954). In reaching that finding the supreme court discussed the voir dire record, concluding it disproved Williams's contention that "an unbiased jury could not be secured because of excitement and prejudice." *Id.* at 744–45. Similarly, we do not find that the responses during jury selection bolster McCunn's presumed-prejudice argument.

inflammatory depends on several factors, including: "the nature, tone, and accuracy of the articles; their timing in relation to the trial; and the impact of the publicity on the jurors as revealed through voir dire." *Siemer*, 454 N.W.2d at 860. We also consider "whether enough time has passed between publication of the material and the trial date so as to dissipate any prejudicial effect that may have been initially created by adverse publicity." *State v. Walters*, 426 N.W.2d 136, 139 (Iowa 1988). In assessing whether publicity is inflammatory in tone, we consider "whether there were any editorial denunciations of the defendant or emotional stories regarding the defendant or the victim." *Id.* Publicity also may be inflammatory if it conveys "inaccurate, misleading, or unfair" information. *Id.*

McCunn contends that because a murder is a rare occurrence in a small and sparsely populated jurisdiction like Page County, "excitement and prejudice resulted from the widespread publicity." But McCunn must offer more than the novelty of a murder in rural Iowa. *See Stonerook v. State*, No. 09-696, 2010 WL 786045, at *2 (Iowa Ct. App. Mar. 10, 2010) ("The bare fact that Mills county is rural and has a sparse population also does not show prejudice.").

So he points to inaccuracies and inflammatory language in the media coverage. As examples, he notes several articles called the murder a "slaying" and others mentioned McCunn's criminal history, his convictions for operating while intoxicated and domestic abuse assault, and that he had a "lengthy track record" and was on probation. He also cites an inaccurate report that there was a long standoff when he was arrested.

The district court ruled that McCunn made "no showing of extensive or prolonged pretrial publicity." The court noted that the articles that McCunn

submitted to support his request to change venue "were all published on just one day, the day after the murder." On our de novo review, we find no abuse of discretion in that ruling.

The change-of-venue record includes twenty-five news articles published about the April 21 murder, all dated April 22 or 23. But the trial did not take place until August. And McCunn did not produce any evidence of publicity between April and August. Even if any prejudicial effect from those initial reports had not worn off, the news coverage was almost entirely informative in tone. Because the reports came so early in the case, they were sparse in detail, naming McCunn and Jordan and offering a bare recitation of the known facts, mostly from the criminal complaint. Although several headlines called the Shenandoah murder a "slaying" and referred to a "standoff," most of the articles used neutral language to say McCunn was located, arrested, and charged with first-degree murder.[5] Even the reports of a "standoff" noted that McCunn surrendered.

In terms of inflaming public emotions, one article quoted a friend of Jordan saying, "[h]e was a really good guy" and "[h]e's got a son." But the tone was not too emotional. Nor do we see any editorial denunciations of McCunn or conclusions that he was guilty of the murder charge. After this initial "burst of news coverage," as the State has it, media interest waned. An undated article did not mention the murder but reported on McCunn's sentencing for other charges. That

---

[5] McCunn does not elaborate on why the word "slaying" is more inflammatory than references to murder. In common parlance, to slay means to kill violently or deliberately. *Slay*, American Heritage Dictionary (2d Coll. ed. 1982). And up until the 1970s, our case law used the term "slayer" when discussing the conditions for self-defense in homicide cases. *See, e.g.*, *State v. Beyer*, 258 N.W.2d 353, 356 (Iowa 1977).

article mentioned his past convictions and his probation for federal charges, but without a date it is unclear how it might have impacted the trial or whether readers could have connected McCunn to the murder charge.

The record also includes three television reports of the murder. One is a thirty-second broadcast from Des Moines. It contains no more than the minimal facts available in the written reports. The second is from the four o'clock broadcast of an Omaha station. That report lasts about ninety seconds and covers what was available in writing. The ten o'clock broadcast from that station, though, states that McCunn was "holed up for hours today in a standoff with police," which is not accurate. Still, the report explains McCunn surrendered. All in all, we echo *Walters*: there was no "sensational reporting of a routine crime"; rather we find "routine reporting of a sensational crime." 426 N.W.2d at 139.

On the other side of the coin, the State called Page County Clerk of Court Julia Walters who testified about the lack of media or community attention to the case in Page County.[6] Although she remembered hearing about the case on radio and newspapers and she considered herself more attuned to criminal activity than the average resident of Page County, she did not think there was much publicity beyond the first day or two. But such testimony was unnecessary. We do not find the pretrial publicity here was so pervasive and inflammatory that it required the court to presume prejudice. We find no abuse of discretion and affirm the denial of the motion for change of venue.

---

[6] The city of Shenandoah straddles Page and eastern Fremont Counties at the southwestern corner of Iowa. The trial was held in Clarinda, the county seat of Page County.

### C. Striking a juror for cause

McCunn next argues the district court erred in denying his motion to strike a juror for cause and the resulting jury was not the constitutionally guaranteed impartial one. *See* U.S. Const. amend. VI, XIV; Iowa Const. art. I, § 10. To help assemble an impartial jury, prospective jurors may be struck for cause when they have "formed or expressed such an opinion as to the guilt or innocence of the defendant as would prevent the juror from rendering a true verdict upon the evidence submitted on the trial." Iowa R. Crim. P. 2.18(5)(k). We review rulings on for-cause challenges for an abuse of discretion. *State v. Jonas*, 904 N.W.2d 566, 570 (Iowa 2017). The court's discretion in such rulings is broad. *Id.* at 571.

During voir dire, the attorneys asked potential jurors to raise their hands if they had heard anything about the case. Raised hands led to individual questioning in the judge's chambers. Juror R.Y. raised his hand. R.Y. explained he had heard "just talk" at work and from friends about the case but no specifics. He affirmed that he could decide the case on the evidence presented at trial.

When asked by defense counsel what people were saying, R.Y. said, "Heard it was a drug deal that went bad and he laid in wait for someone to come home and then shot him." Defense counsel pressed: "I'm concerned that when you hear this kind of information . . . I assume that puts Mr. McCunn in a bad light in your mind today." R.Y. quipped: "Well, not necessarily would be best friends." When asked whether the information would influence his decision, R.Y. said, "I can't say a hundred percent that it won't. I don't know. I'll try not to, but no—for a hundred percent answer, no, I can't say it won't." After discussion from defense counsel about the presumption of innocence, R.Y. professed to understand his

duty but continued to concede that his prior knowledge could influence his decision. The defense asked that he be struck for cause, and the court said,

> [R.Y.], what we want to do is we want to have a jury that will listen to the evidence, see the exhibits, listen to the instructions that I will give at the end of the trial as to what the law is and make a decision just based on those things, not on something that happened outside the courtroom. If I instruct you to do that, would you do that?
> JUROR [R.Y.]: Yeah.
> THE COURT: Would you be able to put aside anything you might have heard before—.
> JUROR [R.Y.]: I mean, again, you know, you can't say a hundred percent; but, yeah, I would try, yes.
> THE COURT: [Prosecutor] Mr. Hammerand, do you want to be heard on the motion?
> MR. HAMMERAND: Yeah. We would resist the motion, Your Honor. We believe this juror—potential juror indicated he could be fair to both sides.

The court agreed and denied the motion.

On appeal, McCunn argues that this exchange shows R.Y. could not put aside what he had learned before trial and apply the presumption of innocence. See *State v. Neuendorf*, 509 N.W.2d 743, 746 (Iowa 1993) (holding trial court should have sustained challenge for cause when juror said she would "try" to set aside what she read about the case). In McCunn's view, the court abused its discretion by not striking the juror for cause. He also contends the court improperly tried to rehabilitate R.Y. *See generally Jonas*, 904 N.W.2d at 572 (discussing dangers of "judicial rehabilitation" and assumption that juror bias can be reduced to "question-and-answer sessions which obtain results in the manner of a catechism").

The State acknowledges the facial similarity between R.Y.'s answers and the juror's responses in *Neuendorf*. But the State distinguishes *Neuendorf* because the juror there knew that a codefendant had been convicted of the same

crime. *Neuendorf*, 509 N.W.2d at 745. By contrast, R.Y. said he didn't know what really happened, and just heard "people talking." The State contends this situation is controlled by *State v. Simmons*, where our supreme court found no abuse of discretion when the judge declined to strike jurors for cause who expressed reservation*s* about their impartiality. *See* 454 N.W.2d 866, 868 (Iowa 1990). The challenged jurors "indicated that, although troubled by what they knew of the case, they would withhold judgment and presume Simmons innocent until the evidence proved otherwise." *Id.*

We agree with the State. R.Y.'s reservations, fomented by defense counsel, were not as profound as those harbored by the juror in *Neuendorf*. R.Y. told the prosecutor that he could decide the case on the proof presented at trial and would set aside any information that did not come in as evidence. R.Y. also told the judge that he could follow the instructions and would not base his decision on something that happened outside the courtroom. On this record, the district court did not abuse its discretion in overruling the motion to strike R.Y. for cause under rule 2.18(5)(k).

And like the State, we find it telling that the defense did not exercise a peremptory challenge to remove R.Y. from the jury panel. By the end of jury selection, McCunn had exercised peremptory strikes against ten other panelists whom he had not challenged for cause, but presumably viewed as more undesirable jurors than R.Y. The State submits that it constitutes "sandbagging"[7]

---

[7] One court tracked the origin of this term to a poker game where "a bully or ruffian [used] a sandbag as a weapon to knock his intended victim unconscious." *Navajo Nation v. Urb. Outfitters, Inc.*, 918 F. Supp. 2d 1245, 1252 n.5 (D.N.M. 2013).

to leave R.Y. on the jury, await the verdict, and then allege prejudice from his service. *See Jonas*, 904 N.W.2d at 583. But McCunn rebuffs the sandbagging accusation. He insists that under *State v. Tillman*, 514 N.W.2d 105, 108 (Iowa 1994), all he had to show was an error in overruling his motion to strike R.Y. for cause and that R.Y. served on the jury.

As discussed, the district court did not abuse its discretion in refusing to strike R.Y. for cause. But even if it did, McCunn misinterprets the prejudice standard from *Tillman*. That case explained:

> Under our prior law, if a challenge for cause had been erroneously overruled, prejudice was presumed if the defendant used all of his peremptory challenges. *State v. Beckwith*, . . . 46 N.W.2d 20, 23 ([Iowa] 1951).
> This rule of presumed prejudice changed with *. . . Neuendorf*, . . . . After *Neuendorf*, the presumption of prejudice no longer applies; the defendant must show (1) an error in the court's ruling on the challenge for cause; and (2) either (a) the challenged juror served on the jury, or (b) the remaining jury was biased as a result of the defendant's use of all of the peremptory challenges. *See* [*Neuendorf*, 509 N.W.2d] at 747.

*Tillman*, 514 N.W.2d at 107–08.

In *Tillman*, the potential jurors challenged for cause were not actually seated. *Id.* at 108. And Tillman could not show that because he ran out of peremptory challenges to remove them, the jurors who actually decided the case were biased. *Id.* Against that backdrop, McCunn misreads *Tillman*'s recitation of the *Neuendorf* test. It does not allow defendants to bypass the opportunity to exercise a preemptory strike, leave a juror they considered to be partial on the panel, and then claim prejudice on appeal. That prejudice standard would be even more lax than *Beckwith*, where prejudice was only presumed if the defendant was "compelled to use his peremptory challenges upon prospective jurors who should

have been excused for cause." *See* 46 N.W.2d at 23. True, *Neuendorf* shifted the focus to "the jury that ultimately sat." 509 N.W.2d at 746. But "for there to be a Sixth or Fourteenth Amendment violation it must be shown that, after the complaining party's peremptory challenges have been exercised, the jury that remains was not impartial." *Id.* (citing *Ross v. Oklahoma*, 487 U.S. 81, 108 (1988)). *Ross* presupposes that McCunn had to remove R.Y. to claim prejudice. *See* 487 U.S. at 88 ("Petitioner was undoubtedly required to exercise a peremptory challenge to cure the trial court's error.").

In *Jonas*, our supreme court took another step. 904 N.W.2d at 566. Under that case, prejudice is automatic when (1) the district court erroneously refuses to strike for cause; (2) the defendant "specifically ask[s] for an additional peremptory challenge of a particular juror after exhausting his peremptory challenges"; and (3) the district court denies the request for another challenge. *Id.* at 583. But "*Neuendorf* remains good law where a judge improperly denies a challenge for cause but the defendant does not specifically ask for an additional peremptory challenge of a particular juror after exhausting his peremptory challenges under the rule." *Id.*

McCunn did not ask for another peremptory challenge to strike R.Y. So prejudice is not automatic. And he cannot profit from the self-inflicted prejudice of leaving R.Y. on the jury. Even if the district court erred in not striking R.Y. for cause, McCunn cannot succeed on this issue.

### D. Prior bad acts evidence

McCunn's final challenge is to prior bad acts evidence. We review its admission for an abuse of discretion. *State v. Goodson*, 958 N.W.2d 791, 798

(Iowa 2021). We reverse if the decision is made on grounds or for reasons that are clearly untenable or unreasonable. *Id.* We do not reverse if the error was harmless. *State v. Richards*, 879 N.W.2d 140, 145 (Iowa 2016).

The evidence at issue involves Jordan's friend Seth Rogers. Rogers testified that McCunn pressured him to help find Jordan. Rogers didn't want to help but testified McCunn is "an intimidating guy, and he's the kind of guy you don't tell 'no' to." Over defense objection, Rogers testified he went to Morelock's home around 11 p.m. When he arrived, McCunn was there and ordered Rogers to participate in tracking down Jordan. Rogers, McCunn, and Morelock drove to a couple of houses, stopped at Wal-Mart to buy a shoulder holster which McCunn donned immediately, then went to the Nishnabotna River. McCunn and Morelock loaded two guns and shot at a road sign. Rogers recalled that McCunn was "just really worked up and . . . angry." McCunn pointed a pistol at Rogers and warned "[t]hat I was going to help him find [Jordan] or he was going to kill me."

McCunn contends the court abused its discretion in allowing Rogers to testify about the threat at gunpoint. He asserts that evidence was not relevant, but if relevant, was inadmissible under Iowa Rules of Evidence 5.403 and 5.404(b).

Evidence is relevant if "it has any tendency to make a fact more or less probable than it would without the evidence" and "[t]he fact is of consequence in determining the action." Iowa R. Evid. 5.401. "Relevant evidence is admissible" unless otherwise prohibited by law. Iowa R. Evid. 5.402. Such prohibitions arise in rules 5.403 and 4.404(b)(1).

Evidence of "a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted

in accordance with the character." Iowa R. Evid. 5.404(b)(1). But that evidence may be admissible to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Iowa R. Evid. 5.404(b)(2). Our analysis follows three steps; we assess whether (1) the evidence is relevant and material to a *legitimate* issue in the case beyond a general propensity to commit wrongful acts; (2) there is clear proof McCunn committed the bad act; and (3) the probative value of the evidence is substantially outweighed by the danger of unfair prejudice to McCunn. *See Richards*, 879 N.W.2d at 145; *see also* Iowa R. Evid. 5.403.

In the State's view, the evidence that McCunn threatened Rogers at gunpoint was relevant to establish McCunn's motive, malice aforethought, and premeditation, as well as to disprove justification. And, the State argues, any error in admitting the evidence was harmless because it was cumulative and the other evidence was overwhelming.

We find no abuse of discretion in allowing Roger's full testimony. That evidence revealed that McCunn was angry with Jordan, had the means to kill him, and was forging a plan to do so. Roger's testimony highlighted McCunn's fixed purpose to find Jordan. Even if he had to intimidate Jordan's friend into helping at the point of a pistol. The specific threat to Rogers goes beyond propensity evidence to legitimate issues in the case. On top of that, McCunn was asserting a justification defense, so the acts he took to confront Jordan were probative of whether he provoked the use of force or reasonably believed that he was in imminent danger from Jordan. *See People v. Tucker*, 530 N.E.2d 1079, 1087 (Ill.

Ct. App. 1988) (finding similar evidence admissible when defendant asserted self-defense).

> Moving to the balancing test, we consider

> the need for the evidence in light of the issues and the other evidence available to the prosecution, whether there is clear proof the defendant committed the prior bad acts, the strength or weakness of the evidence on the relevant issue, and the degree to which the fact finder will be prompted to decide the case on an improper basis.

*State v. Putman*, 848 N.W.2d 1, 9–10 (Iowa 2014) (citation omitted). Granted, McCunn's statement to Rogers was not the State's only evidence of McCunn's motive and planning.[8] The State offered similar proof through Jordan's brother Jacob, as well as Lusk, Archer, and Cepeda. Rogers also testified to an earlier clash between McCunn and Jordan. But the record does not suggest McCunn's armed threat would prompt the jury to decide guilt on an improper basis. McCunn's hunt for Jordan was well documented. The vehemence with which McCunn pursued his white whale was highly probative of his malice and premeditation and was not substantially outweighed by the possibility of unfair prejudice. We find the court properly allowed this evidence.

But even if the court did abuse its discretion, the error was harmless because the evidence was cumulative to that offered through other witnesses. *See State v. Parker*, 747 N.W.2d 196, 209 (Iowa 2008); *see also State v. Sanders-Galvez*, No. 17-2059, 2019 WL 2145707, at *5 (Iowa Ct. App. May 15, 2019).

---

[8] Roger's testimony provides "clear proof" that McCunn made this statement.

### III. Conclusion

To recap, we find no basis for reversal in the jury instructions, the court's decision not to change venue, its refusal to strike juror R.Y. for cause, or the admission of prior bad acts evidence.  So we affirm McCunn's conviction for murder in the first degree.

**AFFIRMED.**